[S.F. No. 23841. Feb. 8, 1979.]

CATHERINE M. BONDANZA et al., Plaintiffs and Appellants, v. PENINSULA HOSPITAL AND MEDICAL CENTER et al., Defendants and Respondents.

COUNSEL

Carol R. Golubock and Thomas R. Adams for Plaintiffs and Appellants.

Carr, McClellan, Ingersoll, Thompson & Horn and David C. Carr for Defendants and Respondents.

OPINION

**MOSK, J.**—The issue in this case is whether a hospital is guilty of an unlawful or unfair business practice (former Civ. Code, § 3369; now Bus. & Prof. Code, § 17200 et seq.) if it assigns a patient's account to an

agency for collection and the agency's commission of one-third of the balance due at the time of assignment is assessed against the patient on the basis of his promise to the hospital to pay a "reasonable . . . collection expense." We conclude that this practice is impermissible under the principles set forth in *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39], and may be enjoined pursuant to the cited statutes.

The named plaintiffs are Catherine M. Bondanza, Jose M. Arrellano, and Raymond Rivera, who were either patients or the parents of patients treated at Peninsula Hospital and Medical Center in 1973 and 1974. At the time of admission, each of them signed an agreement (admission agreement) which obligated them to pay the hospital charges due on the date of discharge. The agreement also provided that if the account was referred to a collection agency or an attorney for collection the debtor would pay "reasonable attorney's fees and collection expense." All patients admitted to the hospital are required to sign such an agreement, except in certain emergency situations.

Bondanza entered the hospital on September 18, 1973, and upon discharge four days later was presented with a bill for $477.36. Her insurer initially denied liability. She explained to the hospital on several occasions during the ensuing months that she did not have the funds to make payment personally, but that she was pursuing her claim with the insurer. In accordance with its usual practice, the hospital attempted to collect the charge by sending mailed notices and telephoning Bondanza.[1] On March 27, 1974, the hospital assigned the account for collection to the Medical Adjustment Service, a collection agency. Under a prior agreement with the agency, the hospital was required to pay the agency a commission of one-third of the amount owed at the time of the assignment, plus any accrued interest thereafter collected.[2]

---

[1]The hospital had a practice of requesting payment at the time of discharge, submitting a statement within a few days thereafter, and sending follow-up statements at the end of each month for four months. The patient was contacted directly about sixty to ninety days after discharge regarding payment, and two "pre-collection assignment" letters were sent about two weeks apart, between five and six months after discharge. These letters, on the letterhead of the Credit Bureau of San Mateo and Burlingame, stated that the account had been reported to the bureau as unpaid, urged that payment be made to the creditor, and warned that failure to respond would make it necessary to "proceed with more drastic collection procedures." Thereafter, if no payment was received or no satisfactory payment plan agreed to between the debtor and the hospital, the account was assigned for collection.

[2]The agreement between the hospital and the collection agency provided that "To partially compensate . . . [the agency] for work done on accounts where there is no

About five weeks after the assignment, on May 9, Bondanza's insurer paid $410.36 of the amount due, leaving a balance of $67. Bondanza notified the hospital that she would pay the balance as soon as possible. In June, however, she received a "Final Notice" from the Medical Adjustment Service demanding payment of $242.80; the sum consisted of the $67 due on the bill and $175.80 in collection costs, representing one-third of the amount owed by her at the time the account was assigned to the agency, plus interest. On July 1, she paid the $67 balance due to the hospital. According to the hospital, its policy was not to enforce the collection charge if the account was paid in full. Nevertheless, 17 days later Bondanza received another letter from the agency demanding payment of the $175.80. Arrellano and Rivera had similar experiences with respect to the amounts they owed the hospital.[3]

Plaintiffs filed an action against the hospital, the Credit Bureau of San Mateo and Burlingame, and the Medical Adjustment Service. The complaint was brought on behalf of the general public, the three named plaintiffs, and a class consisting of those patients admitted to the hospital within the prior three years who had been assessed collection costs under the admission agreement. The first cause of action alleged that defendants' conduct constituted an unlawful and unfair business practice within the meaning of former Civil Code section 3369[4] because the collection costs assessed against plaintiffs amounted to a penalty, the

recovery, and to offset cost losses when court costs are advanced . . ., any interest earned or accrued that may be collected" shall be retained by the agency.

[3]Arrellano incurred a debt of $281.30 for medical services rendered to his daughter, and submitted the bill to his insurer. He was laid off work, and his sole income was from unemployment insurance. He explained to the hospital that he was unable to pay the bill but that he believed his insurer would pay it. The hospital assigned the account to the Medical Adjustment Service, and the agency sought to recover from Arrellano the $281.30, plus $107.34 in collection costs.

Three months after his sons were discharged from the hospital, Rivera owed only $78.40 on his account because of payments made by him and by his insurer. His account was assigned for collection, and he was billed for $107.29, representing the $78.40 due and $28.89 in collection charges.

[4]All references herein are to the Civil Code, unless otherwise stated.

Prior to its amendment in 1977 (Stats. 1977, ch. 299, § 2, p. 1203), section 3369 provided in part:

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"2. Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.

"3. As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice . . . .

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"5. Actions for injunction under this section may be prosecuted by the Attorney

charge was greatly in excess of the actual expense of collection, and it was fixed before any costs had been incurred by the agency.[5] Other causes of action alleged violations of former sections 1670 and 1671.[6] The prayer sought declaratory relief, a determination that the action be maintained on behalf of the general public and as a class action, and an injunction prohibiting use of the admission agreement to recover collection costs except under various circumstances.

Plaintiffs' motion to certify the suit as a class action was denied. Thereafter, the trial court granted defendants' motion for summary judgment, but enjoined them from assessing any collection charges against the three named plaintiffs. Plaintiffs appeal from the ensuing judgment dismissing their complaint in all other respects.

The code authorizes any person to bring an action on behalf of the general public to enjoin an "unlawful, unfair or fraudulent business practice." (Former § 3369, now Bus. & Prof. Code, § 17200.) Plaintiffs do not complain solely of the requirement of the admission agreement that they pay a "reasonable" collection charge, but also of defendants'

General . . . or upon the complaint of any . . . person . . . acting for the interests of . . . the general public."

These provisions are now found, essentially unchanged, in Business and Professions Code section 17200 et seq.

[5]The complaint also alleged that the admission agreement was invalid because it did not specify the amount of the collection cost, the method by which the cost would be computed, or the length of time which must elapse before an obligation would be considered in default.

[6]Section 1670 was repealed and section 1671 was rewritten after the present action was filed. (Stats. 1977, ch. 198, §§ 2, 5, p. 718.) At the time of the complaint herein section 1670 provided: "Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section."

Section 1671 provided: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

The substance of both statutes is now found in subdivision (d) of new section 1671, which declares that in specified cases "a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

The rule applies, inter alia, to "a contract for the retail purchase . . . of personal . . . services, primarily for the party's personal . . . purposes" (*id.,* subd. (c)(1)). The admission agreement in the case at bar is such a contract. It follows that authorities construing former sections 1670 and 1671 remain relevant, and that injunctive relief may be predicated in the case at bar on present section 1671.

practice of implementing that condition by assessing the debtor a charge of one-third of the balance due on the debt at the time of assignment without regard to the actual collection costs incurred. Thus, in discussing the validity of the collection charge, we consider not only the promise made by plaintiffs but the manner in which defendants enforced that promise. We have no doubt that defendants' conduct constitutes a business practice within the meaning of the statutory language.

As we have seen, in the present context the code also prohibits contracts in which the amount of damages is determined in advance unless "it would be impracticable or extremely difficult to fix the actual damage." (§ 1671.) In *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731, we interpreted these provisions as invalidating a charge for late payment of a loan. There, the plaintiffs were obligors under promissory notes secured by deeds of trust in favor of defendant savings and loan association. They had agreed that in the event of default they would pay 2 percent of the unpaid principal balance of the loan obligation for the period during which payment was in default. We held that this provision constituted a penalty, i.e., an attempt to coerce timely payment by a forfeiture not reasonably calculated to merely compensate the lender, but to penalize the borrower. (*Id.,* at p. 740.) The proper measure of damages for the default, we concluded, was the actual damage which resulted, measured by the period of time the money was wrongfully withheld, plus the administrative cost of collecting and accounting for a late payment. (*Id.,* at p. 741.) It was recognized, however, that a liquidated damage provision might have been lawful if the defendant had made the showing required by section 1671, e.g., if impracticability was demonstrated by the circumstance that the amount of actual damage from default was so small that its cost of calculation would exceed the amount agreed to in advance as fair compensation. (*Ibid.*)

In the present case, defendants' practice is a more patent violation of the code than in *Garrett.* Here, there was no agreement between plaintiffs and the hospital as to the amount of collection costs to be paid in the event of default and no effort made between them to estimate a fair compensation for the breach. Instead, plaintiffs agreed to pay a "reasonable" expense; only the hospital and a third party, the collection agency, determined that expense would amount to one-third of the balance due at the time of assignment. Moreover, although defendants have the burden of demonstrating that it would have been impracticable or extremely

difficult to fix actual collection costs (*Chastain v. Belmont* (1954) 43 Cal.2d 45, 58 [271 P.2d 498]; *Lowe v. Massachusetts Mut. Life Ins. Co.* (1976) 54 Cal.App.3d 718, 734 [127 Cal.Rptr. 23]), the record does not disclose they attempted to make any such showing below. In these circumstances, defendants' practice of assessing a debtor a "collection" charge of one-third of the amount due is plainly unlawful.

The underlying unfairness of the practice is also clear, as the admission agreement—including the promise to pay collection costs—is an adhesion contract which a patient must sign as a condition of admission to the hospital in all except limited emergency situations. Medical bills often add up to many thousands of dollars; one-third of the balance due could amount to a substantial sum. Furthermore, as in the present case, a patient who cannot personally pay the charges but who relies on his medical insurance to do so may be penalized for the delays or errors of his insurer—circumstances usually well beyond his control.

Finally, there may be no relationship whatever between the charge assessed against the patient and the actual expense required to collect an account. The charge is calculated on the amount due at the time of assignment, yet it may be that the patient or his insurer has paid all or most of the obligation shortly *after* assignment and before the collection agency has expended any significant effort to collect the debt. For example, Bondanza's account was assigned on March 27, and all but $67 was paid on her behalf by the insurer on May 9. Nevertheless, the collection agency subsequently sought to collect $175.80 from her in costs, an amount more than two and a half times the $67 she owed on May 9.

Thus even if we were not compelled to decide on the authority of *Garrett* that the defendants' conduct herein is unlawful, we would not hestitate to conclude that it constitutes an unfair and unreasonable practice, a determination supported by the case law. In *Beckjord* v. *Slusher* (1937) 22 Cal.App.2d 678 [72 P.2d 563], a provision in a bond to indemnify from " 'all . . . damages, expenses, costs . . . [and] counsel fees' " which the indemnitees would incur in enforcing payment of a bond was interpreted as requiring the indemnitor to pay only reasonable attorney's fees, not necessarily those fees which the indemnitee actually paid his attorney. (*Id.,* at p. 680.) And in *Eastman* v. *Sunset Park Land Co.* (1917) 35 Cal.App. 628, 630 [170 P. 642], it was said that even if a note had provided a stated sum for attorney's fees, nevertheless the court might allow a smaller amount if it found the sum stated to be

unreasonable. (Cf. *Ecco-Phoenix Electric Corp.* v. *Howard J. White, Inc.* (1969) 1 Cal.3d 266, 272-274 [81 Cal.Rptr. 849, 461 P.2d 33]; *Hertzka & Knowles* v. *Salter* (1970) 6 Cal.App.3d 325, 333-336 [86 Cal.Rptr. 23].)

We reject defendant's assertion that their practice does not constitute an attempt to collect liquidated damages but rather is an agreement by plaintiffs to indemnify the hospital for collection costs. In *Clermont* v. *Secured Investment Corp.* (1972) 25 Cal.App.3d 766, 769 [102 Cal.Rptr. 340], a fixed charge of 1 percent of the original amount of a loan, assessed in every instance of late payment regardless of the length of the delay or the extra effort required of the lender, was held to be a liquidated damages clause. And in *Garrett* we said that if damages are ascertained in anticipation of breach, their validity must be tested by the standards set forth in former sections 1670 and 1671. (9 Cal.3d at p. 735.) The arrangement described above clearly constitutes liquidated damages under these principles.

But, claim defendants, even if the assessment does amount to liquidated damages it is nevertheless lawful because it represents the precise amount which the hospital pays to the collection agency. The contention is bottomed on a theory that even though the hospital itself could not impose the charge because it is not a measure of the true collection cost to the hospital if it had collected the debt, nevertheless because the hospital must pay this sum to the third-party collection agency under its prior agreement with the latter, the charge represents the actual "collection expense" within the meaning of the admission agreement. The simple answer to the contention is found both in the requirements of section 1671 and in the fundamental rule that a creditor cannot increase the burden on a debtor by assigning the debt. (See § 1459.)

■ Next, defendants assert that the collection charge is a proper measure of the costs which plaintiffs agreed to pay because it is both necessary and reasonable. Although the point is not entirely clear, defendants appear to claim that even though the charge may not represent the actual cost of collecting the particular account it is nevertheless reasonable because in order to stay in business a collection agency must apportion its overall expenses among the accounts that it successfully collects, so as to reimburse it for expenses incurred in pursuing accounts that prove to be uncollectible.

Defendants misunderstand the thrust of *Garrett* and the requirements of section 1671. The claimed apportionment is irrelevant to the issue whether, in the words of *Garrett,* the charge to a particular debtor "could be fairly measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting and accounting for a late payment." (9 Cal.3d at p. 741.) Pursuant to this rule an individual debtor may not be charged a fee calculated on the income that a collection agency to which the debt is assigned needs or desires in order to flourish economically. In the case at bar the hospital is free to assign plaintiffs' obligations to a collection agency, and may pay the agency a fee for that service agreed upon between them; but under the authorities cited herein, plaintiffs cannot lawfully be required to guarantee the economic well-being of the agency.

In their amended complaint plaintiffs prayed for an injunction which defendants correctly characterize as too uncertain to provide a standard of conduct for the activities proscribed. (*City of Vernon* v. *Superior Court* (1952) 38 Cal.2d 509, 513 [241 P.2d 243]; *Brunton* v. *Superior Court* (1942) 20 Cal.2d 202, 205 [124 P.2d 831].) Nevertheless, plaintiffs are entitled to any relief that their complaint justifies. (Code Civ. Proc., § 580.) ■ Since we have concluded that defendants' conduct constitutes an unlawful and unfair business practice, plaintiffs are entitled to an injunction prohibiting defendants from assessing patients who sign the admission agreement a collection expense of one-third of the amount owed at the time of assignment, or any other sum which does not represent the actual costs of collection as defined in *Garrett.*

In view of this determination, we do not reach plaintiffs' assertion that the trial court erred in denying class action certification; on appeal, plaintiffs advance their class action claim only as an alternative to injunctive relief.

The judgment is reversed with directions to grant injunctive relief consistent with the views expressed herein.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**MANUEL, J.**—I dissent.

In my view the opinion of the majority has misconceived the character of the contractual provision here in question and, in so doing, arrives by

means of disruptive legal reasoning at an incorrect result. I would affirm the judgment of the trial court.

The agreement here in question provided in pertinent part as follows: "In consideration of the services to be rendered to the patient, he will be individually obligated himself and the patient (if he is acting as an agent of the patient) to pay the account of the patient in accordance with the current rates of the hospital. The account will be due and payable in full on the date on which the patient is discharged from the hospital, and time is of the essence with respect to such due date. *Should the account be referred to a collection agency or an attorney for collection, the undersigned shall pay reasonable attorney's fees and collection expense.*" (Italics added.)

The majority, looking beyond the clear terms of this language to "the manner in which defendants enforced that promise" (*ante,* p. 266), purport to find therein the germ of an unenforceable liquidated damages provision. This, in my view does nothing less than turn the contractual language on its head. A liquidated damage provision, whether of the enforceable or the unenforceable variety, is one in which *the parties agree* to a specific amount or formula for making certain the amount of damages to be deemed sustained as a result of any future breach. (See *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 738-739 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39] and cases there cited; see generally Sweet, *Liquidated Damages in California* (1972) 60 Cal.L.Rev. 84, fn. 2; 38 Ops.Cal.Atty.Gen. 195, 197 (1961).) Here no such agreement has occurred, for as the majority opinion itself points out, "there was no agreement between plaintiffs and the hospital as to the amount of collection costs to be paid in the event of default and no effort made between them to estimate a fair compensation for the breach." (*Ante,* p. 266.) In view of this I am at a loss to understand how the majority can conclude that we here deal with a liquidated damages provision and proceed to assess its validity as such.[1]

---

[1]Quite a different situation would be presented if we were here concerned with the hospital's admission agreement as it was amended following the trial proceedings herein. Apparently at the suggestion of the trial court, the hospital in September 1975 revised its financial agreement to provide: "It is agreed that in consideration of the services to patient, the patient (and agent if signed by name) is obligated to pay the account due to hospital in accordance with its regular rates and terms, which shall be DUE IN FULL ON DATE OF DISCHARGE (time is of the essence). If unpaid on the due date, such account shall be subject to a DELINQUENCY CHARGE equal to 1½% per month thereafter. Further, if unpaid within 30 days after written notice, hospital may refer said account to a collection agency or an attorney for collection, and in that event the amount due MAY BE INCREASED by an amount equal to the collection charge payable to such agency (35% of

The parties' agreement was in fact a very simple and common one, providing for the recovery by the hospital of "reasonable attorney's fees and collection expense" in the event the account was referred to a collection agency or an attorney for collection. The basic issue before us is equally simple: Were the fees and expenses here assessed reasonable in light of all of the circumstances?

Although the limited record on which this matter was presented to us[2] does not directly reflect the trial court's view in this respect, it would appear from its order and judgment—which essentially refused to enjoin continued use of the practice in question but enjoined its application to plaintiffs—that the court came forth with two answers, one relating to the inherent character of the fee arrangement and the other relating to the application of that arrangement in light of the particular facts before the court. Thus it apparently concluded (1) that the arrangement had not been shown to be inherently unreasonable or unfair and therefore could not be enjoined as an unfair business practice under the former provisions of section 3369 of the Civil Code, but (2) that the assessment of the fees and expenses in issue in the instant case was unreasonable in light of the fact that plaintiffs had received no notice of the amount of the contingent charges[3] and were not recalcitrant in failing to make payment. I agree—and presumably the majority of the court would agree[4]—with the second of these determinations. I also agree with the first; however, the majority, as I understand it, do not.

In my view there is nothing inherently unreasonable in an arrangement whereby a hospital, after absorbing collection costs up to a certain point

the balance due) or by reasonable attorney's fees (as set by any Court), which the undersigned agrees to pay." This may indeed be a liquidated damages provision, for the parties thereto *agree* to the use of certain numerical factors for the determination of damages presumed to flow from breach. The question of its validity under the provisions of section 1671 of the Civil Code, in the words of a well-reasoned Attorney General's opinion, "would, in each instance, be a question of fact dependent upon the particular contractual arrangement." (38 Ops.Cal.Atty.Gen. 195, 196, *supra.*)

[2]The matter was presented on appeal by means of a settled statement. (Cal. Rules of Court, rule 7(b).)

[3]See footnote 1, *ante.*

[4]The dispositive order at the conclusion of the majority opinion, which reverses the entire judgment "with directions to grant injunctive relief consistent with the views expressed herein" (*ante*, p. 269), appears to contemplate an injunction which would permit the entry of a future judgment against plaintiffs for "actual costs of collection as defined in *Garrett* [v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731]." (*Ante*, p. 269.) We may wonder whether plaintiffs themselves will find this result preferable to that reached by the trial court.

in the collection process,[5] contracts with a collection agency (which, unlike the hospital, is after all in the business of collecting delinquent accounts) to collect an account which remains unpaid. Nor is it inherently unreasonable for the hospital, as a part of its contractual arrangements with the collection agency, to seek indemnity for the fee to be charged it by the agency by authorizing the latter to demand its fee from the debtor. It is only when (1) the account is referred to the agency for collection at a point which, in all of the circumstances, must be deemed premature (such as in the instant case, in the apparent view of the trial court) or (2) when the fee charged by the agency and passed on to the debtor is unreasonably high, that the fee may be said to be "unreasonable" within the meaning of the contract between the hospital and the debtor.

Here, as I have pointed out, the trial court apparently determined that, in light of all of the circumstances applicable to plaintiffs, premature referral to the collection agency occurred. There was no evidence in the record that this was a customary practice, however, and no basis for the broader injunction sought by plaintiffs is here provided. Furthermore, the record contains no allegations or statements supporting any conclusion that the percentage charged by the collection agency was unreasonably high or incommensurate with the competitive fee charged by such agencies in the community. (See 38 Ops.Cal.Atty.Gen. 195, 198, *supra*; cf. 57 Ops.Cal.Atty.Gen. 293, 294 (1974).)

[5]In its answer to certain pretrial interrogatories of plaintiffs, defendant hospital stated that it normally follows these procedures and steps in the collection of overdue accounts:

"1. Request payment of patient balance at the time of discharge or arrangements made for payment plan.

"2. Submit an itemized statement showing the patient balance within a few days after discharge.

"3. Submit follow-up statements at the end of each month for approximately four months.

"4. Contact patient directly about 60 to 90 days after discharge if no payment, requesting payment or arrangements for payment plan.

"5. If steps 1 through 4 are unsuccessful is [*sic*] obtaining or starting payments, send two pre-collection assignment letters (Exhibits 1 and 2) about two weeks apart about 150-180 days after discharge.

"6. If no payment or arrangements for payment plan thereafter, refer to collection agency about 180 to 210 days after discharge.

"Note: above schedule assumes no payments. If partial payment or payment plan are made at any point along the way, the above steps will vary accordingly."

The preassignment letters referred to in step five are on the stationery of the collection agency, but they are sent out by the hospital. They direct the debtor to make all payments, and address communications, directly to the creditor hospital. I express no present opinion as to whether the practice referred to in paragraph 5 above violates the provisions of subdivision (f) of section 6947 of the Business and Professions Code, which refers to the furnishing of forms to others by a collection agency licensee.

As the Court of Appeal pointed out in its carefully considered opinion in this matter: "It must be assumed that the charges of the collection agency can be no lower than what is necessary to keep it in business. On the high side, insofar as it charges more than the traffic should bear, it leaves itself open to the threat of competition and regulation. From its nature the collection agency cannot apportion its charges to the actual expense of each individual collection. It must apportion all of its expenses, incurred in successfully or unsuccessfully attempting to collect delinquent accounts, for all of the creditors it serves, over those accounts which it actually collects. If it only charged the latter the actual costs of the individual collection, it would soon be out of business, as conversely would be the insurance company which returned all the premiums to those insureds who suffered no loss. We cannot say as a matter of law that the percentage fee is an unreasonable way for the collection agency to run its business. If reform is needed it should be through existing regulation,[6] not by an attempt through the courts to examine the expenses incurred on behalf of the multitude of customers, which the form letters in this case indicates the collection agency serves, and the paying habits of those from whom it attempts, successfully or unsuccessfully to collect."

I would affirm the judgment.

Clark, J., and Richardson, J., concurred.

---

[6]Collection agencies, of course, are extensively regulated under the provisions of the Collection Agency Act (Bus. & Prof. Code, §§ 6850-6956) and the rules and regulations issued pursuant thereto by the Director of Consumer Affairs (see § 6863; Cal. Admin. Code, tit. 16, ch. 7, §§ 600-699.7). (See also Civ. Code, tit. 1.6C (§§ 1788-1788.32) of pt. 4 of div. 3, the "Robbins-Rosenthal Fair Debt Collection Practices Act," as added by Stats. 1977, ch. 907, § 1, eff. Jan. 1, 1978.) The instant action is not predicated upon a violation of any of these statutes or regulations. (See and cf. 57 Ops.Cal.Atty.Gen. 293, *supra.*)