[No. B006342. Second Dist., Div. Seven. May 28, 1985.]

BAYPOINT MORTGAGE CORPORATION, Plaintiff and Respondent, v. CREST PREMIUM REAL ESTATE INVESTMENTS RETIREMENT TRUST, Defendant and Appellant.

820

**COUNSEL**

Iungerich & Huang, Russell Iungerich and Jack Oswald for Defendant and Appellant.

Cedric Troncoso for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—In this case the trial court granted a preliminary injunction against the foreclosure of a number of trust deeds. The principal legal issue is whether a beneficiary of a trust deed can foreclose for tardy payment of an installment during the period before late payment charges accrue. We conclude the trial court did not abuse its discretion in finding the balance of hardships burdened the party against whom foreclosure was sought. We likewise conclude the court did not abuse its discretion in finding this same party has a reasonable probability of prevailing on the merits in its attempt to stop the foreclosure. Accordingly, we affirm the order granting the preliminary injunction.

### FACTS AND PROCEEDINGS BELOW

Baypoint Mortgage Corporation (Baypoint) is in the business of buying trust deeds. Crest Premium Real Estate Investments Retirement Trust (Crest Premium) is the ERISA Pension Plan of Western States Title Company. Crest Premium is the beneficiary on 23 all-inclusive deeds of trust. On or about November 1982 Baypoint acquired junior deeds of trust which were

part of these 23 all-inclusive deeds of trust. Baypoint thereby assumed the obligation of the trustor on the deeds of trust and obligor on the 23 notes secured by these deeds.

The underlying promissory notes provide that principal and interest is "*'payable'* on the first day of each calendar month . . . . Payor herein agrees to pay to the beneficiary herein a *late payment penalty* of 10% of the monthly payment on any payment not received by beneficiary within ten (10) days from the due date. *At the option of the payor herein said late charge will be paid in cash or added to the principal balance of the note and thereafter bear like interest as the principal.*" (Italics added.)

Meantime each of the deeds of trust states: "F. In the event Trustor [Baypoint] fails to meet the payments required under the Promissory Note secured hereby, then such failure shall constitute a default under this All-Inclusive Deed of Trust entitling Beneficiary to all of the rights and remedies hereunder."

The deeds of trust provide: "(7) That by accepting payment of any sums secured hereby after its due date, Beneficiary does not waive his right either to require prompt payment when due *of all other sums* so secured or to declare default for failure so to pay." (Italics added.)

Crest Premium alleges that from November 1982 through December 1983 Baypoint was habitually tardy in making its monthly payments on these trust deeds. The payments were never *received* by Crest Premium on the first day of the month. On the other hand, they were never *received* later than the 13th day of the month. According to Crest Premium's own allegations the monthly installment payments ranged from five to twelve days late with five of those payments received ten or more days after the first of the month and nine installments received nine or fewer days after the first of the month. These payments were mailed to a post office box since Crest Premium did not have an office address. Thus, although Crest Premium claims not to have *received* payment until five to twelve days after the first of the month, the installments actually may have been mailed several days earlier in each instance. In any event, Crest Premium periodically sent notices to Baypoint asserting it had incurred late charges and enclosing a statement of the total amount of late charges which had accrued.

Then on November 17, 1983, Crest Premium sent a certified letter to Baypoint. This letter warned Baypoint Crest Premium expected Baypoint to send its monthly installments so that they were *received* by Crest Premium no later than 5 p.m. on the first day of each month. In the event payments

were not *received* by that date and time, Crest Premium indicated it would commence foreclosure proceedings against the trust deeds. Shortly thereafter, a Baypoint official telephoned Crest Premium and advised it could not pay the loan installments on the first of the month because it first had to collect from its own debtors on junior loans.

December 1, 1983, came and went without the installment payments being received. True to its warning, on December 5, 1983, Crest Premium recorded notices of default on all 23 deeds of trust. On December 6, 1983, Baypoint mailed the December installment payments. (The envelope containing these payments was postmarked Dec. 7, 1983.) Crest Premium, however, alleges it did not receive these checks until December 12, 1983, and thus late charges accrued for this December 1983 installment as well as the five earlier installments allegedly not *received* within ten days of the first of the month. Despite its claim the December payments were late and its pending foreclosure action for, among other things, nonpayment of those installments, Crest Premium accepted the December checks and deposited them in its account.

On January 25, 1984, Baypoint filed a complaint seeking various forms of relief connected with the Crest Premium's attempted foreclosure action. The complaint seeks declaratory relief, a permanent injunction, an accounting, damages for bad faith conspiracy, damages for bad faith foreclosure and unfair competition/business practices. Baypoint applied for a temporary restraining order which the court denied. However, the court did hold a hearing on an application for preliminary injunction on February 28, 1984. The court granted this preliminary prohibitory injunction in an order filed March 6, 1984. The injunction prohibits Crest Premium from proceeding with any further action under the notices of default, from filing notices of trustee sales or selling the real property secured by the trust deeds. Before issuing the injunction, the trial court required Baypoint to file a bond in the amount of $39,000.

Crest Premium filed a timely notice of appeal from the order granting the preliminary injunction. Briefing was completed on November 15, 1984.

### DISCUSSION

### I. STANDARD OF REVIEW

█ This appeal is from a grant of a preliminary prohibitive injunction. The grant of this form of injunction does not determine any of the merits of the controversy. (*Continental Baking Co.* v. *Katz* (1968) 60 Cal.2d 512,

528 [67 Cal.Rptr. 761, 439 P.2d 889]; *State Bd. of Barber Examiners* v. *Star* (1970) 8 Cal.App.3d 736, 740 [87 Cal.Rptr. 450].) Nor does it require a finding the party seeking the preliminary injunction will necessarily prevail on the merits. Instead trial courts in California apply a two-part test: "1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. . . . ' "[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him." ' " (Citations omitted.) (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206, 207 [211 Cal.Rptr. 398, 695 P.2d 695].) ■ Generally speaking, the grant or refusal of a preliminary injunction is within the discretion of the trial court and its order may be reversed on appeal only if abuse of discretion is shown. (*Gosney* v. *State of California* (1970) 10 Cal.App.3d 921, 924 [89 Cal.Rptr. 390].) Discretion is abused in the legal sense " ' "whenever it may be fairly said that in its exercise the court . . . exceeded the bounds of reason or contravened the uncontradicted evidence." ' " (Citations omitted.) (*Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d 512, 527.)

Under this standard, then, we as the reviewing court must merely determine whether the trial court "exceeded the bounds of reason" in determining Baypoint has a "reasonable probability of prevailing on the merits" and that the "balance of hardships" favors Baypoint. We can reverse the order only if appellant demonstrates an abuse of discretion in resolving these two issues. (*Gosney* v. *State of California, supra,* 10 Cal.App.3d 921, 924.) For reasons set forth below, we find no such abuse has been shown.

## II. Baypoint Was Threatened With Greater Hardship From Refusal of a Preliminary Injunction Than Crest Premium Faces From Grant of the Injunction

■ As to the balance of hardships we have no trouble finding the court properly exercised its discretion when it concluded the plaintiff faces greater harm from denial of the injunction than defendant would from its issuance. Here, the defendant seeks to foreclose several hundred thousand dollars worth of trust deeds. Should the defendant prevail at trial the worst that it will have suffered will have been some delay in foreclosure. The bond will secure it against any additional or further losses. Moreover defendant will be in a position at that time to recoup any late fees which the court determines were actually owed. The plaintiff, on the other hand, stands to lose all of its trust deeds as well as being chargeable with the foreclosure ex-

penses which may amount to $15,000 or so unless the foreclosure is restrained. His prayer for a permanent injunction against the foreclosure, if granted, would be useless since the trust deeds already would have been sold. Much of the other relief he seeks in the main action likewise would be rendered irrelevant. Given the drastic implications of a foreclosure, it is not surprising to find courts quite frequently granting preliminary injunctions to forestall this remedy while the court considers a case testing whether it is justified under the facts and law. (See, e.g., *Stockton* v. *Newman* (1957) 148 Cal.App.2d 558 [307 P.2d 56]; *Bisno* v. *Sax* (1959) 175 Cal.App.2d 714 [346 P.2d 814].)

### III. BAYPOINT HAS A REASONABLE PROBABILITY OF PREVAILING ON THE MERITS

We likewise find the trial court did not abuse its discretion in concluding Baypoint demonstrated a reasonable probability it will prevail on the merits in preventing Crest Premium's attempted foreclosure. Crest Premium's claim Baypoint is in default rests primarily on the tardy payment of the December 1983 installment. To a lesser and unclear extent, it relies on the nonpayment of accrued late charges. On the evidence before the trial court, we find neither of these constituted defaults justifying foreclosure. Indeed it is questionable whether they amounted to defaults at all under the terms of these loan documents.

A. *There Is a Reasonable Probability the Facts at Trial Will Show Foreclosure Is Not Justified by Baypoint's Failure to Have Paid the December Installment by the Fifth of the Month*

As will be recalled, the evidence before the trial court indicated Crest Premium declared default on December 5, 1983, for the alleged nonpayment of sums due on December 1, 1983. The court could well conclude there was at least a reasonable probability Baypoint was not in default on December 5 as to the December 1 installment.

1. *A Payment Made Within the Period Before Late Charges Accrue Cannot Normally Be Deemed a Default Justifying Foreclosure*

As will be recalled, these loan documents provided the monthly installments were "payable" on the first of the month. But as also will be recalled, the same instruments stated late payment fees would not be chargeable unless payment had not been received on or before the tenth of the month.

Time is not the essence of a contract unless it is so declared. (*Bisno* v. *Sax, supra,* 175 Cal.App.2d 714, 721.) " 'The general rule in equity is

that time is not of the essence unless it has been made so by its express terms or is necessarily so from the nature of the contract. (Williston on Contracts, vol. III (rev.ed. 1936), p. 2385.) In *Miller* v. *Cox,* 96 Cal. 339 . . . it is stated that the intent to make a particular date, or time, "the essence of the contract must be clearly, unequivocally and unmistakably shown by an express declaration. . . .""'" (175 Cal.App.2d at p. 721.) ■ The degree to which time is the essence and what constitutes timely performance under a contract must be construed from all of the terms of the agreement. ■ A contract which essentially says that payment is not so untimely as to warrant the relatively mild consequence of a 10 percent late payment fee unless it is made after the tenth day of the month is not reasonably interpreted as making payment on the first so much the essence of the contract that it warrants the much more drastic remedy of forfeiture. And no subsequent letters—no matter how frequent or definitive or threatening in their language—can alter the terms of the original contract. Where a contract can be reasonably construed to define timely performance as sometime in the first 10 days of the month, it cannot be changed retroactively by a letter which purports to redefine the meaning of that feature of the contract.[1]

Defendant cites a California treatise and an Alabama case for the proposition that a late payment fee clause does not create a "grace period." (1 Miller & Starr, Current Law of Cal. Real Estate (1984 supp.) at p. 207; *Auto-Plaza, Inc.* v. *Central Bank of Alabama* (Ala. 1980) 394 So.2d 6.) We do not feel this is the settled law of California. We have not found nor been cited to any California decisions on this issue. Nor do we consider this or any other California court to be bound either by treatise writers or by Alabama court decisions. Our own research has uncovered cases from other jurisdictions which have found a late payment fee clause indeed creates a "grace period." For instance, in a Florida case, *Federal Home Loan Mortgage Corporation* v. *Taylor* (Fla.App. 1975) 318 So.2d 203, 206 the court held the effect of such a provision "is that the monthly installment is due on the first day of the month, but there is a grace period of fifteen days

---

[1]Crest Premium cites a number of California cases which hold a lender can *resuscitate* a "time is of the essence" provision which has been waived by a pattern of accepting late performance. And this act of resurrection indeed typically is accomplished by sending a letter warning tardy performance will no longer be tolerated. (*Boone* v. *Templeman* (1910) 158 Cal. 290, 296 [110 P. 947]; *Lopez* v. *Bell* (1962) 207 Cal.App.2d 394, 398, 399 [24 Cal.Rptr. 626]; see also *Gonzalez* v. *Hirose* (1948) 33 Cal.2d 213, 216 [200 P.2d 793]; *Harmon Enterprises, Inc.* v. *Vroman* (1959) 167 Cal.App.2d 517, 522 [334 P.2d 628], *Bledsoe* v. *Pacific Ready Cut Homes, Inc.* (1928) 92 Cal.App. 641, 645 [268 P. 697].) These cases, however, do not suggest a letter of this nature can *create* life where none existed before. Here, unlike the cases cited by Crest Premium, the loan documents failed to make payment on the first of the month the essence of the contract at the outset. Consequently, there was nothing for Crest Premium's November 17 letter to revive.

within which it may be paid without further obligation." (See also *Blanchard & Calhoun Realty* v. *Fogel* (1951) 207 Ga. 602 [63 S.E.2d 382]; but see *Foothill Ind. Bank* v. *Mikkelson* (Wyo. 1981) 623 P.2d 748 [no grace period where loan documents expressly stated late payment fee could be assessed *in lieu of* acceleration of remaining payments at the option of the creditor].)

In any event, the rationale we suggest above is somewhat different. In the circumstances of this case, we do not consider the issue to be whether the late fee clause constitutes a "grace period" to be allowed as a matter of law *after timely performance is due*. Rather, we construe this clause to *define what shall constitute timely performance* of the payment terms of the loan and trust deed. To put it another way, we construe this clause to affect whether time is the essence of the payment terms of this loan and to what degree time is of the essence. We hold it negates a finding payment on the so-called "due date" to be the essence of these loans.[2] Consequently, equity will not allow the drastic sanction of foreclosure to be used to enforce compliance with payment on the "due date."

2. *There Is a Reasonable Probability Baypoint Will Prevail on the Issue Whether Equity Will Sanction Forfeiture as the Remedy for Minor Delays in Installment Payments*

As an independent and sufficient grounds supporting this preliminary injunction we look to the propriety of using the ultimate remedy of foreclosure to punish minor tardiness in making monthly installment payments. For purposes of this discussion we temporarily assume time was the essence of this loan and, furthermore, assume payment of installments on the first of the month was the time which was of the essence. Nonetheless, we hold it is reasonably probable under the circumstances of this case that equity will not allow foreclosure to be used as a means of enforcing such precise compliance with this term of the loan.

---

[2]Our research also uncovered an unreported appellate court opinion from Ohio which addressed this very issue. (*Krivins* v. *Smyers* (9th Dist.Ct.App. Ohio, No. 9935, Apr. 22, 1981.) We quote it only for its persuasive value and not because we rely on it in any way as precedent for our own decision. In this opinion reversing a forfeiture of a land contract where the vendees had delivered a "bad check" *40 days* after the so-called "due date," the court held: "Although the contract provides that time is of the essence, it also provides for a ten percent late charge. Such a provision is inconsistent with the notion that time is of the essence, since it shows that the appellees would, in fact, accept late performance. (Citations omitted.) Since forfeiture provisions must be strictly construed against those for whose benefit they are introduced (citation omitted) the 'time is of the essence' clause will be disregarded."

Throughout these proceedings, and especially on appeal, Crest Premium has stressed it seeks to use this foreclosure action solely to coerce Baypoint to make its monthly installment payments on the first day of the month. As emphasized in its opening brief:

> "I. *RETIREMENT TRUST Seeks Only the Enforcement of the Terms of the Notes and Deeds of Trust, And Does Not Desire To Foreclose BAYPOINT'S Interest, But Only To Force Timely Payment by BAYPOINT.*

> ". . . Mr. Bankston has declared that the Notices of Default were just the last resort to compel BAYPOINT to make its payments on the first of each month as it is obligated to do (and which it has agreed to do) under the terms of the promissory notes secured by the deeds of trusts held by RETIREMENT TRUST.

> ". . . . . . . . . . . . . . . . . . . . . . . .

> ". . .RETIREMENT TRUST has merely sought to lawfully exercise a power available to it to compel the fulfillment of such terms." (Italics added.)

Indeed as will be recalled, Crest Premium filed its foreclosure action when the December installment was still only five days late—*even if we assume payment on the first was of the essence of the contract.* Then it turned around and accepted this installment when it was received on December 12th and cashed the check. Nonetheless, despite accepting what it considered a tardy payment, Crest Premium continued on with the foreclosure action. It did so on the theory the payment did not cure part of the default, that is, the failure of the installment to have been received by Crest Premium on December 1st. It emphasizes Baypoint can relieve its default and avoid actual foreclosure by paying a few items—essentially the accrued late fees and, more significantly, the expenses of the foreclosure action. The latter add up to almost $15,000.

It is evident Crest Premium expects the threat of foreclosure actions will compel Baypoint to pay its future installments on or before the first of the month. This follows because any time Baypoint failed to do so, Crest Premium would be in a position to file a foreclosure action. And each time it would cost Baypoint some $15,000 in payments to trustees, etc. to avoid actual foreclosure. Thus, in essence, Crest Premium would be able to impose a $15,000 penalty for late payments even when those payments were only a day or two late. Since the installments Baypoint owes run about $12,000 a month, that late payment penalty would exceed 100 percent of the monthly payments themselves.

■ "The law looks with disfavor upon forfeitures, . . ." (*Talbot* v. *Gadia* (1954) 123 Cal.App.2d 712, 719 [267 P.2d 436].) It is particularly reluctant to enforce forfeitures where the default is minor. " '[E]quity should relieve the defendant from a mere technical default in the payment of interest on the . . . mortgage.' " (*Bisno* v. *Sax, supra,* 175 Cal.App.2d 714, 727, quoting with approval from *Trowbridge* v. *Malex Realty Corp.* (1921) 198 App.Div. 656 [191 N.Y.S. 97, 102-104].) (See also *Ascherman* v. *McKee* (1956) 143 Cal.App.2d 277 [299 Cal.Rptr. 367]; *Talbot* v. *Gadia, supra,* 123 Cal.App.2d 712.)

■ In another line of cases, the California courts have disapproved the use of excessive financial penalties to coerce timely payment of loan installments. (See, e.g., *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39]; *Bondanza* v. *Peninsula Hospital & Medical Center* (1979) 23 Cal.3d 260 [152 Cal.Rptr. 446, 590 P.2d 22].) They have ruled late payment fees cannot be set at a high level for this purpose. Such provisions have been held invalid by the California Supreme Court because they constitute "a penalty, i.e., an attempt to *coerce timely payment by a forfeiture* not reasonably calculated to merely compensate the lender, but to penalize the borrower." (*Bondanza* v. *Peninsula Hospital & Medical Center, supra,* 23 Cal.3d 260, 266, italics added.) Indeed the courts have limited these fees to an amount necessary to compensate for the actual damages occasioned by the delay and to defray the administrative costs legitimately associated with delayed payment. (*Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731, 741.)

■ We find the trial court could conclude the evidence at trial will probably demonstrate Crest Premium persists in this foreclosure action primarily—if not solely—for the purpose of creating a financial penalty designed to coerce payments of future installments on the first of the month. We hold this constitutes a penalty analogous to an excessive late payment fee and therefore equity will not permit foreclosure for this purpose.[3] ■ " 'A penalty need not take the form of a stipulated fixed sum; any provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty.' " (Citation omitted.) (*Freedman* v. *The Rector* (1951) 37 Cal.2d 16, 21, 22 [230 P.2d 629, 31 A.L.R.2d 1].) "We have consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfei-

---

[3]The foreclosure remedy, of course, will be available to enforce ultimate payment of the late fees which have been added to the principal of the loan. But the remedy will not be usable for this purpose until the final installment and any remaining principal become due which ordinarily will be at the end of the loan period.

tures." (Citations omitted.) (*Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731, 737.) Moreover, we further find the trial court could reasonably conclude the December payment will not prove to have been tardy enough to justify the draconian remedy of foreclosure.

B. *It Appears Crest Premium Has Abandoned This Claim of Default, but in Any Event There Is a Reasonable Probability the Facts at Trial Will Show Foreclosure Is Not Justified by Baypoint's Alleged Failure to Pay Accrued Late Payment Fees*

At the time it filed this foreclosure action, and in its appellate brief, Crest Premium asserted a second default—the failure to pay accrued late payment fees. During oral argument, however, appellant appeared to expressly abandon this claim of default, relying instead solely on the tardiness of the December payment. Thus, we consider it in this opinion only to lay to rest any attempt to resurrect this justification for the foreclosure.

It is readily apparent why Crest Premium would not want to rely on nonpayment of alleged late payment fees to support this foreclosure action. To begin with, it is entirely possible when all the evidence is before the court it will find Baypoint owes no late fees to Crest Premium. In order for a late fee to be owed as to any payment, that payment must have been made more than 10 days after the first of the month. Baypoint alleges it mailed all payments before the 10th day. Both sides agree payment was made to a post office box, not an office address. Crest Premium asserts that it frequently did not receive the payments until a day or two after the tenth, while on other occasions admitting that it received payment before the tenth. December 1983 is a typical month. Baypoint's claim that it mailed the payments on December 6 was confirmed by Crest Premium's admission the envelopes it received were postmarked December 7. It is true Crest Premium did not deposit these checks until December 12. It seems unlikely it took five days for the envelopes containing these checks to go from Los Angeles to LaCanada-Flintridge. A more likely explanation is that these checks remained in Crest Premium's post office box for several days before being picked up and deposited in the bank. If this proves to be the state of the facts as to all of the payments on these trust deeds, no late payments would be owed.

More significantly, even assuming the evidence at trial were to show that Baypoint had made some payments more than 10 days after they were due, that would not necessarily mean Crest Premium could foreclose for nonpayment of the accrued late fees. As will be recalled, the operative language of the late payment fee clause specifically permits the debtor the option of

allowing accrued late fees to be added to the principal of the trust deed and to merely pay interest on the incremental increase in the principal of the trust deed.[4]

Under this assumption about the true facts, the court properly enjoins the foreclosure at this preliminary stage because Crest Premium has declared a default as to the full amount of the accrued late fees, a sum far in excess of what would be owed under the terms of the security instruments. On the other hand, if Crest Premium indeed is attempting to foreclose because of nonpayment of the *interest* on any late payment fees which may have accrued it should say so. This, in turn, would present the trial court another issue on which Baypoint has a reasonable probability of prevailing. That issue is whether such a de minimis breach—after all, we are talking about a matter of very few dollars—provides sufficient grounds for the drastic remedy of foreclosure.

## CONCLUSION

One of the most important functions of the law is to maintain a proper balance between creditor and debtor. To this end, it attempts to match the creditor's remedy to the debtor's default. Major defaults justify drastic remedies; minor defaults only warrant lesser remedies. Thus, where the debtor is unable or unwilling to pay at all the creditor is entitled to recapture the security the debtor gave for the loan. By threatening this ultimate loss the creditor often succeeds in pressuring the recalcitrant debtor into coming up with the money to pay the debt after all. If not, the creditor is at least made whole or as nearly whole as he can be by return of the property the debtor put up to secure the loan.

In this case, appellant Crest Premium asks this court to sanction the use of this same drastic remedy to deal with a minor and common failure of debtors—making installment payments a few days after the initial "due date." This is the functional equivalent of employing a blunderbuss to kill a gnat. Indeed the loan papers in this case afforded the creditor a remedy

---

[4]In its petition for rehearing, appellant Crest Premium alleges the language allowing the late fees to be added to principal was "a typographical error." It also alleges this typographical error was corrected in a 1979 modification which gave this option exclusively to Crest Premium. This merely illustrates what is emphasized more than once in our opinion. Neither the granting of a preliminary injunction nor an appellate opinion upholding this action finally determines the merits of this case. For all we know, at trial the respondent will dispute the existence of the 1979 modification or come forward with a further modification which restores the debtor's option to add late fees to the principal of the loan. We are not in a position to resolve this factual issue at this time nor is its resolution important to our decision. The trial court did not abuse its discretion in granting this preliminary injunction.

more in keeping with the nature of the debtor's offense—a 10 percent "late payment fee" which is imposed after 10 days delay when the gnat at least could be said to have turned into a fly.

Great mischief could be visited on creditor-debtor relations in California were we to accept Crest Premium's invitation. To allow creditors to impose foreclosure—and its attendant expenses—whenever a debtor is a few days late in a monthly payment would open up thousands or perhaps millions of California homeowners and other debtors to an extraordinary additional financial burden. Moreover, the threat of such a severe penalty would place undue pressure on debtors thus destroying the important but delicate balance between creditors and debtors.

In any event, for the reasons discussed earlier in this opinion we find Baypoint has demonstrated a reasonable probability of prevailing on the merits in its attempt to permanently enjoin Crest Premium from completing this particular foreclosure action. Since we also have found the "balance of hardships" favors—or burdens—Baypoint more than Crest Premium, we conclude the trial court was justified in issuing the preliminary injunction in this case.

DISPOSITION

The judgment (order issuing the preliminary injunction) is affirmed.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied June 27, 1985, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 14, 1985.