**INCOME PROPERTIES/EQUITY TRUST, a California business trust; Richard C. Jones, as trustee, Plaintiffs–Appellants,**

v.

**WAL–MART STORES, INC., a Delaware Corporation, Defendant–Appellee.**

No. 93–3992.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1994.

Decided Aug. 29, 1994.

Rehearing Denied Oct. 18, 1994.

Anthony S. Divincenzo, Chicago, IL, argued for appellants.

Timothy Edward Howell of Fayetteville, AR, argued for appellee (Sidney P. Davis, on brief).

Before LOKEN, Circuit Judge, HENLEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

LOKEN, Circuit Judge.

Income Properties/Equity Trust ("IPET") seeks damages from Wal–Mart Stores, Inc. ("Wal–Mart"), for breach of an agreement to vacate a shopping center lease and for tortious interference with IPET's negotiations with a prospective new tenant. The district court [1] granted Wal–Mart's motion for summary judgment, concluding that the real party in interest on the contract claim is Great Southern Savings Bank ("Great Southern"), which purchased IPET's interest as shopping center lessor in a foreclosure sale, and that IPET's injury was not proximately caused by Wal–Mart's alleged tortious interference. IPET appeals. We affirm.

Since 1972, Wal–Mart has leased 94,000 square feet of space in the Walnut Plaza Shopping Center in Rogers, Arkansas. In early 1991, Wal–Mart and the lessor, IPET, discussed whether Wal–Mart would vacate a substantial portion of the lease so that IPET could lease that space to Harp's Food Stores ("Harp's") at a higher rent. The discussions culminated in a May 30, 1991, letter from Wal–Mart's Sales/Leasing Representative to IPET's Managing Trustee:

> This letter serves as confirmation of Wal–Mart's acceptance of the understanding set forth in your letter of May 29, 1991, and as set forth below:
>
> 1. Subject to the completion of a fully executed lease with HARP'S for approximately 68,000 square feet and the release of Wal–Mart's obligations as to these premises at the time of the date of execution of the lease. Wal–Mart will pay base rent on the 68,000 square feet for the lesser of nine months from the date of execution of the lease or until HARP'S opens for business.
>
> 2. The Trust (landlord) will purchase the .0354 acres of land located in the parking area from Wal–Mart for a total price of $130,000.00, which purchase is contingent upon a fully executed lease between Income Properties/Equity Trust and HARP'S.
>
> 3. Wal–Mart will remain on the prime lease as to the remaining 18,000 and 8,000 square footage for the balance of the term.
>
> In order to ensure our getting this matter approved, it is essential that HARP'S and Income Properties/Equity Trust reach an agreement as expeditiously as possible. Please keep me apprised of your progress.

Five months later, with a lease between IPET and Harp's as yet unsigned, IPET alleges, and Wal–Mart does not deny, that Wal–Mart advised both IPET and Harp's that Wal–Mart had decided to retain the entire leased premises. IPET also alleges, and again Wal–Mart does not deny, that Harp's then broke off its lease negotiations with IPET. Wal–Mart remained in the shopping center under the "prime" lease.

In September 1992, Great Southern, an IPET creditor, filed an action in Arkansas state court to foreclose IPET's interest in the Walnut Plaza Center. In November 1992, IPET commenced this lawsuit in an Illinois state court. In count 1, IPET alleged that Wal–Mart breached a contract to vacate

---

1. The HONORABLE H. FRANKLIN WATERS, Chief Judge of the United States District Court for the Western District of Arkansas.

space in the shopping center, causing IPET to lose rental income from Harp's in excess of $40,000.00. In Count 2, IPET alleged that Wal–Mart tortiously interfered with IPET's potential business advantage by informing Harp's of Wal–Mart's intention not to vacate. Wal–Mart removed the action to federal court, and it was transferred to the Western District of Arkansas in March 1993.

Great Southern acquired IPET's interest as lessor at a July 7, 1993, foreclosure sale. The amended foreclosure decree provided:

> WAL–MART STORES, INC.... is the Lessee under a certain lease dated May 1, 1972 and such Lease is a valid and enforceable lease remaining in full force and effect with all right, title and interest of the Lessor assigned to the Plaintiff, GREAT SOUTHERN SAVINGS BANK....

The district court then granted Wal–Mart's motion for summary judgment dismissing both counts, and IPET appealed.

### A.

IPET first argues that the district court erred in concluding that IPET is not the real party in interest on the contract claim. "[U]nder both Federal and Arkansas law the person to whom a complete and absolute assignment of rights arising *ex contractu* has been made is the real party in interest and the proper person to bring suit to enforce such rights." *Cobb v. National Lead Co.*, 215 F.Supp. 48, 51 (E.D.Ark.1963). The foreclosure decree expressly assigned IPET's interest in the Wal–Mart lease to Great Southern, but it made no mention of a separate contract in which Wal–Mart promised to vacate a portion of that lease and also sell another parcel of land to IPET. Under Arkansas law, rights and interests "not regarded as incidental to the assignment[ ] must be specifically mentioned to pass to the assignee." *Wasson v. Taylor*, 87 S.W.2d 63, 65 (Ark.1935). Thus, the issue is whether IPET's claim for breach of Wal–Mart's promise to vacate the lease was incidental to

IPET's assigned interest as shopping center lessor.

IPET argues that it was damaged by Wal–Mart's breach of contract prior to the foreclosure sale and this pre-foreclosure damage is not "incidental" to the subsequent assignment of the Wal–Mart lease to Great Southern. IPET relies upon *Farm Bureau Cooperative Mill & Supply, Inc. v. Blue Star Foods, Inc.*, 238 F.2d 326, 331 (8th Cir.1956) (chattel mortgage assignment did not include tort action arising from breach of the mortgage), and *Wasson*, 87 S.W.2d at 65 (note and mortgage assignment did not include cause of action against trustee for negligent handling of the note and mortgage). This argument requires close analysis of IPET's pre-foreclosure conduct as the promisee of Wal–Mart's promise to vacate.

Wal–Mart's alleged breach of its promise to vacate the lease occurred when the promise was executory because IPET had not signed a new lease with Harp's. Nevertheless, if Wal–Mart declared its "positive and unequivocal refusal to perform" a binding promise, it was guilty of an anticipatory repudiation of the contract. *Kellum v. Gray*, 266 Ark. 996, 590 S.W.2d 33, 34 (Ark. Ct.App.1979). Repudiation permits the promisee to treat the contract as ended and sue for breach of contract. *See Stocker v. Hall*, 269 Ark. 468, 602 S.W.2d 662, 665 (1980). Had IPET taken this action and sued prior to foreclosure, it would have declared the agreement to vacate ended, thereby acknowledging that Wal–Mart would remain under the prime lease. With performance of the agreement to vacate no longer possible, IPET would have distanced its pre-foreclosure damage action from its lessor's interest in future shopping center operations. This breach of contract claim, then, would presumably not be incidental to the subsequent foreclosure sale.[2]

IPET did not pursue this course of action. Instead, its attorneys wrote Wal–Mart in October 1991 asking it to reaffirm the promise to vacate, and then IPET took

---

2. However, to recover damages for anticipatory repudiation, the promisee must prove that all conditions precedent to performance would have been performed. *See Quivirian Dev. Co. v. Poteet,* 268 F.2d 433, 440 (8th Cir.1959). Depending upon the course of the IPET/Harp's negotiations, this might have been a difficult hurdle.

no further action prior to foreclosure—it did not perform the contract by signing a lease with Harp's, nor seek to enforce it, nor declare an anticipatory repudiation. Thus, if one looks at the conduct of the contracting parties, the alleged agreement to vacate remained executory when Great Southern commenced foreclosure, awaiting performance by IPET (a new lease with Harp's) and then by Wal–Mart.[3] It is only IPET's subsequent allegations in this lawsuit that create the appearance of an anticipatory repudiation. And even that appearance is illusory, for IPET also accuses Wal–Mart of interfering with IPET's lease negotiations with Harp's, an allegation that only has substance if the agreement to vacate the Wal–Mart lease is executory, not repudiated.

Establishing that the alleged agreement to vacate was executory when foreclosure began significantly changes the real-party-in-interest analysis. For this executory agreement could only be implemented by the lessor, the only party capable of negotiating a lease with Harp's, which in turn would satisfy the precondition to Wal–Mart's promise to vacate. In other words, *performance* of the contract was clearly incidental to IPET's interest as lessor; only pre-foreclosure *repudiation* could even arguably disentangle the contract from the prime lease that Wal–Mart had promised to vacate. But IPET did not declare the contract repudiated prior to foreclosure. Nor as a party to the foreclosure did it attempt to enforce the promise to vacate as part of that proceeding. Indeed, it silently allowed Great Southern to acquire the Wal–Mart lease in a foreclosure decree that declared, "upon sale of the said land and property and confirmation thereof by this Court, the ... estates of the lessees ... shall remain in accordance with the terms of their respective leases." Because performance of the executory agreement to vacate would have affected the estates of the lessor and Wal–Mart under the prime lease, at the time of foreclosure that agreement was incidental to the prime lease and therefore was assigned to Great Southern in the foreclosure sale. In these circumstances, we agree with the district court that Great Southern, not IPET, is the real party in interest to any surviving claim that Wal–Mart breached the agreement to vacate.[4]

**B.**

The district court ruled that IPET is the real party in interest on its tortious interference claim but granted Wal–Mart summary judgment on the merits of that claim. On appeal, IPET argues that the district court erred because Wal–Mart's refusal to vacate the prime lease tortiously interfered with IPET entering into a new lease with Harp's. We disagree. Under Arkansas law, "breach of a contract is not a tort." *Quinn Cos. v. Herring–Marathon Group, Inc.*, 299 Ark. 431, 773 S.W.2d 94, 95 (1989). Even if Wal–Mart told Harp's that it had repudiated its promise to vacate the lease, causing Harp's to break off negotiation of a new lease as futile, this does not convert IPET's contract claim into a tort claim. It might excuse IPET's non-performance of a condition precedent to Wal–Mart's promise to vacate. But any recoverable damages suffered by IPET were caused by Wal–Mart's breach of contract. Any adverse effect on IPET's relations with Harp's was an incidental consequence of the breach of contract, not an independent basis for liability in tort. *See McNeill v. Security Benefit Life Ins. Co.*, 28 F.3d 891, 894 n. 4 (8th Cir.1994).

The judgment of the district court is affirmed.

---

3. Even if Wal–Mart's prior conduct had amounted to an anticipatory repudiation, a party who has repudiated an executory promise may retract its repudiation, without penalty, at any time prior to a material change of position by the promisee. *See Kellum,* 590 S.W.2d at 34–35; 4 *Corbin on Contracts* § 980 (1951).

4. IPET argues that the district court should have given IPET a chance to join Great Southern as a party plaintiff. *See* Fed.R.Civ.P. 17(a). However-

er, IPET had ample opportunity to join Great Southern, raising a strong inference that the new lessor is content not to press Wal–Mart's alleged promise to vacate its lease. Moreover, we fail to see how joinder would benefit IPET, which has no interest in Great Southern's contract claim. The district court expressly noted that its dismissal did not affect Great Southern's rights. There was no abuse of discretion in dismissing.