KAPUNAKEA PARTNERS and Waiehu Beach Partners, Plaintiffs,

v.

EQUILON ENTERPRISES LLC, dba Shell Oil Products US, Defendant.

Civ. No. 09–00340 ACK–KSC.

United States District Court, D. Hawai'i.

Nov. 23, 2009.

---

1204

David Geoffrey Brittin, Frederick W. Rohlfing, III, Case Lombardi & Pettit, Honolulu, HI, for Plaintiffs.

Donna A.O. Yoshimoto, Nathan H. Yoshimoto, Ogomori & Yoshimoto, LLP, Honolulu, HI, for Defendants.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS COUNTS I AND II OF THE COMPLAINT

ALAN C. KAY, Senior District Judge.

### PROCEDURAL HISTORY

On July 2, 2009, Plaintiffs Kapunakea Partners, a Hawai'i limited liability partnership ("Kapunakea LP"), and Waiehu Beach Partners, a Hawai'i limited liability partnership ("Waiehu LP"), filed a complaint ("Complaint") against Defendant

Equilon Enterprises LLC dba Shell Oil Products U.S. ("Shell") in the Circuit Court for the Second Circuit of the State of Hawai'i. The Complaint asserts the following counts: (I) unfair methods of competition under Hawai'i Revised Statutes ("HRS") § 480–2; (II) interference with a prospective economic advantage; (III) declaratory judgment; and (IV) breach of contract. The Complaint includes as exhibits a number of the documents that are at issue in this case.

On July 23, 2009, Shell removed the action to this Court based on diversity jurisdiction. On September 3, 2009, Shell filed a motion to dismiss Counts I and II of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6), along with a memorandum in support ("Def.'s Mem."). Shell does not seek dismissal of Count III or IV at this time. On November 5, 2009, Plaintiffs filed an opposition ("Pls.' Opp'n"). On November 12, 2009, Shell filed a reply ("Def.'s Reply"). On November 23, 2009, the Court held a hearing on the motion to dismiss.

### FACTUAL BACKGROUND [1]

#### I. The Agreements

Kapunakea LP is the owner of improvements for gas facilities, a convenience store, a car wash, and retail office spaces at a property located on Kapunakea Street in Lahaina, Hawai'i. Compl. ¶ 5. Waiehu LP is the owner in fee of a property located on Waiehu Beach Road in Wailuku, Hawai'i. Id. ¶ 21. Both Plaintiffs are gasoline dealers. Id. ¶¶ 6, 22.

Effective May 1, 2004, Kapunakea LP and Waiehu LP each entered into a coupling of agreements with Shell. They specifically entered into retail sales agreements ("Retail Sales Agreements") and recapture agreements ("Recapture Agree-

ments"), the latter of which included addenda ("Recapture Agreements Addenda") (collectively, "Agreements"). In the Retail Sales Agreements, Shell agreed to sell and Plaintiffs agreed to buy certain quantities of gasoline. Id. ¶¶ 7, 23.

In the Recapture Agreements, Shell agreed to provide Plaintiffs with funds to make certain improvements at their respective gas stations. Id. ¶¶ 8, 24. In exchange, Plaintiffs agreed to purchase certain minimum volumes of gasoline set forth in Exhibit A to the Recapture Agreements ("Recapture Volume"). Compl., Ex. 2 at 1–2, Ex. 7 at 1–2. Plaintiffs also agreed that, if they failed to purchase the Recapture Volumes in any twelve-month period specified in Exhibit A to the Recapture Agreements, they would pay Shell an amount equal to the difference between the Recapture Volumes and the actual amount of gallons of gasoline purchased from Shell for resale at their stations during the twelve-month period multiplied by the rate per gallon figure for the applicable twelve-month period specified in Exhibit A ("Recapture Volume Shortfall Payment"). Id. To illustrate, Exhibit A to Kapunakea LP's Recapture Agreement provides that, in year one, the Recapture Volume is 2,400,000 gallons of gasoline, and the rate per gallon is $0.05. Compl., Ex. 2 at 7. Thus, if Kapunakea LP only purchased 2,300,000 gallons of gasoline from Shell in year one, it would fall short of the Recapture Volume by 100,000 gallons. That amount would then be multiplied by $0.05, the rate per gallon specified in Exhibit A, to equal $5,000.00, which would represent Kapunakea LP's Recapture Volume Shortfall Payment for year one in this hypothetical.

In the two Agreements, Plaintiffs are each referred to as "Retailer." Section

---

1. The facts in this Order are recited for the limited purpose of deciding the motion to dismiss and shall not be construed as findings of fact upon which the parties may rely in future proceedings in this case.

2(d) of the Recapture Agreements Addenda provides that:

Notwithstanding Retailer's obligation to comply with the Brand Commitment specified in the [Recapture] Agreement, Retailer may terminate the [Retail Sales Agreement] and [Recapture] Agreement at any time within the first 12–month period after the Effective Date of the [Retail Sales Agreement] and [Recapture] Agreement upon 30 days' written notice prior to the expiration of the first 12–month period. If Retailer exercises its right to terminate, Retailer shall reimburse Shell those sums due plus interest at the rate of 6% per annum, if applicable, for early termination pursuant to the terms of the [Recapture] Agreement; provided, however, Retailer will not be obligated to pay Shell the liquidated damages for lost profits and shortfalls specified under Articles 6(b) and 6(c) of the [Recapture] Agreement.

Compl., Ex. 3 at 2, Ex. 8 at 2 (Recapture Agreements Addenda).[2]

Articles 6(b) and 6(c) of the Recapture Agreements provide:

(b) If the [Retail Sales Agreement] is terminated prior to the end of any 12–month period specified in Exhibit A, Retailer shall pay Company a final Recapture Volume Shortfall Payment based on the difference between Retailer's purchases through the end of the last full month prior to the date of termination and the Recapture Volume prorated on a monthly basis.

(c) The parties agree that in the event of the termination of [the Recapture] Agreement, including, but not limited to, any failure to execute and deliver the [Retail Sales Agreement], Company will be damaged and entitled to compensation for such damages. Such damages will be extremely difficult and impracticable to determine. In addition, both parties wish to avoid the time and expense of protracted litigation that would result if Company filed a lawsuit to collects [sic] its damages for breach of [the Recapture] Agreement. In such event, the parties agree that the amount of Five cents ($0.0500) per gallon multiplied by the difference between the total Recapture Volume specified in Exhibit A and the volume of Products purchased by Retailer from Company for resale at Retailer's Station during the term of [the Recapture] Agreement prior to termination constitutes a reasonable estimate of Company's damages and Retailer shall pay Company such amount as liquidated damages and in lieu of the remedy afforded Company under Article 2(b) of the [Retail Sales Agreement].

Compl., Ex. 2 at 2, Ex. 7 at 2 (Recapture Agreements).

## II. Plaintiffs' Termination of the Agreements

On April 28, 2005, Plaintiffs gave Shell written notice of their decisions to terminate the Retail Sales Agreements and Recapture Agreements. Compl. ¶¶ 12, 28.[3]

2. The copies of the Recapture Agreements Addenda attached as exhibits to the Complaint refer to "Articles 6(b) and 6(c)." Compl., Ex. 3 at 2, Ex. 8 at 2 (Recapture Agreements Addenda). However, the Complaint refers to "Articles 7(b) and 6(c)" in quoting and discussing the Recapture Agreements Addenda. *See* Compl. ¶¶ 10, 13, 26, 29. At the same time, in other instances, the Complaint refers to "Articles 6(b) and (c)." *Id.* ¶¶ 17, 33. Consistent with the copies of the Recapture Agreements Addenda and cer-

tain points in the Complaint, it would appear that the Complaint's references to "Articles 7(b) and 6(c)" were meant to read "Articles 6(b) and 6(c)," and the Court will construe them as such.

3. In its termination notice, which is dated April 28, 2005, Kapunakea LP stated that:

As we previously discussed and agreed, both in person and via correspondence, the Retail Sales Agreement and all documents

Plaintiffs maintain that they have terminated the Agreements consistent with Section 2(d) of the Recapture Agreements Addenda and that they are thus not obligated to pay Shell liquidated damages. for lost profits and shortfalls specified under Articles 6(b) and 6(c) of the Recapture Agreement. *Id.* ¶¶ 13, 29. By letter dated May 13, 2005, Shell asserted that Plaintiffs have not timely exercised their rights to terminate under Section 2(d) of the Recapture Agreements Addenda and that, upon the effective date of termination, they will therefore owe the liquidated damages specified under Articles 6(b) and 6(c) of the Recapture Agreement. *Id.* ¶¶ 14, 30. Plaintiffs allege that Shell has improperly refused to acknowledge that the Agreements have effectively been terminated and has insisted that they continue to purchase gasoline and other related products from Shell. *Id.* ¶¶ 15, 31. They claim that, because of the enormous financial penalty threatened by Shell's refusal to acknowledge that the Agreements were effectively terminated on April 28, 2005, and because of Shell's insistence that they will be liable for liquidated damages when the Agreements are effectively terminated, they have been forced to continue to purchase products from Shell. *Id.* ¶¶ 16, 32.

Prior to providing notice of termination, Plaintiffs were negotiating with Aloha Petroleum and Mid Pac Petroleum to purchase gasoline at a cheaper price than that offered by Shell. *Id.* ¶¶ 18, 34. Plaintiffs informed Shell's sales agent that such negotiations were taking place. *Id.* ¶¶ 19, 35. They claim that, because Shell improperly refused to acknowledge their allegedly timely termination of the Agreements, they were unable to proceed with finalizing

agreements with either Aloha Petroleum or Mid Pac Petroleum. *Id.* ¶¶ 20, 36. Plaintiffs contend that Shell purposefully acted with an improper motive of harming them when it improperly refused to accept their termination in order to prevent them from entering into agreements with other companies to purchase gasoline at a lower price. *Id.* ¶ 44. They insist that Shell also acted with the improper motive of retaining as much business as possible so as to maintain its dominant market position on Maui and charge higher prices than would otherwise be available. *Id.* ¶ 45.

Plaintiffs claim that the liquidated damages specified in Articles 6(b) and 6(c) of the Recapture Agreements bear no relation to Shell's actual damages, which were not difficult to estimate at the time the Agreements were executed. *Id.* ¶¶ 17, 33. They therefore assert that the liquidated damages represent penalties to discourage them from exercising their rights to terminate under the Agreements. *Id.*

Although Shell does not seek dismissal of Count III or IV of the Complaint, it is nevertheless instructive to review the claims asserted in those counts. In Count III, Plaintiffs argue that they are entitled to a judgment declaring that they need not pay damages under the liquidated damages provisions set forth in Articles 6(b) and 6(c) of the Recapture Agreements because they gave timely notice of termination. *Id.* ¶¶ 50–51. And, in Count IV, Plaintiffs contend that Shell is in breach of the terms and conditions of the Agreements, including its duty of good faith and fair dealing in its performance and enforcement of the Agreements. *Id.* ¶ 53. Shell assumes *arguendo* that it is in

dated May 1, 2004 between Shell Oil Products U.S. and Kapunakea Partners would be terminated in accordance with procedures contained in Section 2. item (d) of the Recapture Agreement Addendum dated May 1, 2004. Therefore in accordance with

that section of the Recapture Agreement Addendum I am giving Shell the required thirty-day notice of my intention to terminate.

Compl., Ex. 4.

breach of the Agreements for purposes of its motion to dismiss. *See* Def.'s Mem. 18, 28.

## LEGAL STANDARDS

Fed.R.Civ.P. 12(b)(6) permits dismissal of a complaint that fails "to state a claim upon which relief can be granted." "A Rule 12(b)(6) 'dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.'" *Zamani v. Carnes*, 491 F.3d 990, 996–97 (9th Cir.2007) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001)) (brackets omitted).

Under the rule, review is generally limited to the contents of the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001); *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). Courts may also "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003). Documents whose contents are alleged in a complaint and whose authenticity are not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion to dismiss. *See Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994).

On a Fed.R.Civ.P. 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir. 1996). However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss. *See Sprewell*, 266 F.3d at 988; *Nat'l Ass'n for the Advancement of Psychoanalysis v. California*

*Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir.2000); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir.1996). Moreover, the court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint. *Sprewell*, 266 F.3d at 988.

## DISCUSSION

Shell seeks dismissal of Counts I and II of the Complaint. The Court will evaluate each count in turn.

### I. Count I of the Complaint: Unfair Methods of Competition Under HRS § 480-2

In Count I of the Complaint, Plaintiffs assert that Shell's actions constitute unfair methods of competition that adversely impact consumers in violation of HRS § 480–2. Compl. ¶ 38. Plaintiffs maintain that, as a result of Shell's allegedly unfair methods of competition, they were injured in their business and property and are entitled to recover treble damages as well as attorneys' fees and costs. *Id.* ¶ 39.

Shell contends that Plaintiffs have not sufficiently alleged that it has engaged in unfair methods of competition. Def.'s Mem. 13–14. It maintains that Plaintiff's assertions of unfair methods of competition are based solely on its alleged breaches of the Agreements when it: (1) refused to acknowledge that the Agreements were effectively terminated; (2) continued to enforce the Agreements by requiring that Plaintiffs continue to purchase gasoline and other related products; and (3) enforced the Agreements by insisting that Plaintiffs will be liable for liquidated damages as specified in the Recapture Agreements when the Agreements were effectively terminated. *Id.* at 17–18. Shell argues that Count I must

be dismissed because, as a matter of law, its alleged breaches of the Agreements do not, without more, constitute unfair methods of competition under HRS § 480–2. *Id.* at 14.

## A. Background on Unfair Methods of Competition Under HRS § 480–2

HRS § 480–13 states that "any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by [HRS ch. 480] . . . [m]ay sue for damages sustained by the person," including treble damages, and "[m]ay bring proceedings to enjoin the unlawful practices." HRS §§ 480–13(a)(1), (2).[4] There are "three elements essential to recovery under HRS § 480–13:(1) a violation of HRS chapter 480; (2) injury to the plaintiff's business or property resulting from such violation; and (3) proof of the amount of damages." *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n,* 113 Hawai'i 77, 114, 148 P.3d 1179, 1216 (2006) (footnote omitted).

HRS § 480–2 provides in relevant part that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." HRS § 480–2(a). "Any person may bring an action based on unfair methods of competition declared unlawful by this section." *Id.* § 480–2(e). On the other hand, "[n]o person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section." *Id.* § 480–2(d).

" 'Consumer' means a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase

goods or services or who commits money, property, or services in a personal investment." *Id.* § 480–1. "An unincorporated association . . . is not a natural person.' " *Ass'n of Apt. Owners v. Venture 15, Inc.,* 115 Hawai'i 232, 252, 167 P.3d 225, 245 (2007) (quoting *W.C.M. Window Co. v. Bernardi,* 730 F.2d 486, 493 (7th Cir.1984)) (emphasis and brackets omitted). "Consequently, an unincorporated association is not a 'consumer' as defined by HRS § 480–1." *Id.* Although such an association may not file an action under HRS § 480–2 for unfair or deceptive acts or practices, "any person may bring a claim of unfair methods of competition based upon conduct that could also support a claim of unfair or deceptive acts or practices as long as the nature of the competition is sufficiently alleged in the complaint." *Hawaii Med. Ass'n,* 113 Hawai'i at 113, 148 P.3d at 1215.

"Although HRS § 480–2 does not define unfair competition, it 'was constructed in broad language in order to constitute a flexible tool to stop and prevent unfair competition and fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen and businesswomen.' " *Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co.,* 91 Hawai'i 224, 255 n. 34, 982 P.2d 853, 884 n. 34 (1999) (quoting *Han v. Yang,* 84 Hawai'i 162, 177, 931 P.2d 604, 619 (App.1997)) (brackets omitted). "Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances." *Hawaii Med. Ass'n,* 113 Hawai'i at 108, 148 P.3d at 1210 (quoting *Cieri v. Leticia Query Realty,* 80 Hawai'i 54, 60,

---

**4.** Apart from affording damages and injunctive relief, HRS ch. 480 also declares that "[a]ny contract or agreement in violation of

[HRS ch. 480] is void and is not enforceable at law or in equity." HRS § 480–12.

905 P.2d 29, 35 (1995)). " 'The word "unfair" means conduct that (1) threatens an incipient violation of an antitrust law, or (2) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or (3) otherwise significantly threatens or harms competition.' " *Robert's,* 91 Hawai'i at 255 n. 34, 982 P.2d at 884 n. 34 (quoting *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 544 (1999)) (brackets omitted). In addition, "competitive conduct 'is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " *Id.* (quoting *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 51, 919 P.2d 294, 313 (1996)).

The latter definition of "unfair" appears to derive from the United States Supreme Court's decision in *Federal Trade Commission v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). *See id.* at 244 n. 5, 92 S.Ct. 898, *cited in Spiegel, Inc. v. Federal Trade Comm'n,* 540 F.2d 287, 293 n. 8 (7th Cir. 1976), *quoted in Rosa v. Johnston,* 3 Haw. App. 420, 427, 651 P.2d 1228, 1234 (1982), *quoted in E. Star, Inc. v. Union Building Materials Corp.,* 6 Haw.App. 125, 133, 712 P.2d 1148, 1154 (1985), *quoted in State ex rel. Bronster,* 82 Hawai'i at 51, 919 P.2d at 313, *quoted in Robert's,* 91 Hawai'i at 255 n. 34, 982 P.2d at 884 n. 34. There, the Supreme Court "put its stamp of approval on the [Federal Trade] Commission's evolving use of a consumer unfairness doctrine not moored in the traditional rationales of anticompetitiveness or deception."

*Am. Fin. Serv. Ass'n v. Federal Trade Comm'n,* 767 F.2d 957, 971 (D.C.Cir.1985).

Specifically, the Supreme Court noted that, "in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nevertheless unfair," the Federal Trade Commission considered the following factors:

"(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."

*Sperry & Hutchinson,* 405 U.S. at 244 n. 5, 92 S.Ct. 898 (quoting Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8,324, 8,355 (1964)). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 Fed.Reg. 59,614, 59,635 (1978), *quoted in Cheshire Mortg. Serv. v. Montes,* 223 Conn. 80, 612 A.2d 1130, 1143–44 (1992) (interpreting the Connecticut Unfair Trade Practices Act).[5]

---

**5.** The Connecticut Supreme Court, which has looked to the standard set forth in *Sperry & Hutchinson* in interpreting the Connecticut Unfair Trade Practices Act, has observed that "a serious question exists concerning whether [that standard] remains the guiding rule utilized by the federal trade commission." *Am. Car Rental, Inc. v. Comm'r of Consumer Prot.,* 273 Conn. 296, 869 A.2d 1198, 1205 n. 6 (2005) (citing *Am. Fin. Serv.,* 767 F.2d at 969–70).

### B. Whether Enforcement of Penalty Provisions May Constitute an Unfair Method of Competition

With the foregoing principles in mind, the Court will now consider Shell's argument that a breach of contract, without more, does not constitute an unfair method of competition or an unfair or deceptive practice in the conduct of any trade or commerce under HRS § 480–2. *See* Def.'s Mem. 14. There is merit to this contention.

Courts construing unfair competition statutes similar to HRS § 480–2 have held that a breach of contract alone is not enough to support a claim under those statutes. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (noting that, under California's unfair competition statute, " '[a] breach of contract may form the predicate for [an unfair competition] claim, provided it also constitutes conduct that is unlawful, or unfair, or fraudulent' " (quoting *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 319 F.Supp.2d 1059, 1074 (C.D.Cal.2003))); *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C.App. 321, 572 S.E.2d 200, 206 (N.C.Ct. App.2002) (" '[A]ctions for unfair and deceptive trade practices are distinct from actions for breach of contract and . . . a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [North Carolina's

unfair and deceptive trade practices statute].' To recover for unfair and deceptive trade practices, a party must show substantial aggravating circumstances attending the breach of contract." (quoting *Branch Banking & Trust Co. v. Thompson*, 107 N.C.App. 53, 418 S.E.2d 694, 700 (N.C.Ct.App.1992)) (ellipsis omitted)). The notion that a mere breach is not a sufficient basis for an unfair competition claim seems particularly appropriate where, as here, an unfair competition statute imposes treble damages. *See Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 347 (4th Cir.1998) (applying North Carolina law).

If Plaintiffs had simply alleged a normal breach of contract, the Court would be inclined to dismiss their HRS § 480–2 claim because, as Shell correctly observes, the claim appears to be premised on Shell's alleged breach of the Agreements. *See Sybersound Records*, 517 F.3d at 1152 (concluding that the district court properly dismissed an unfair competition claim under California's statute because, *inter alia*, the plaintiff, a karaoke record company, had "not pled that the breaches of contract [by the defendants, competitor karaoke record companies,] [were] independently unlawful, unfair, or fraudulent," but had instead merely asserted "that the [defendants] do not pay royalties or acquire licenses from other co-owners, in breach of their contracts with licensors and the [c]ustomers").[6]

---

**6.** Plaintiffs point out that, in *Hawaii Medical Ass'n*, physicians sued a health insurer, asserting that they had not received monies to which they were contractually entitled as part of the basis for their claim under HRS ch. 480. Pls.' Opp'n 9 (citing *Hawaii Med. Ass'n*, 113 Hawai'i at 88, 148 P.3d at 1190). They note that, at no point in the Hawai'i Supreme Court's exhaustive review of Hawaii law on unfair methods of competition in that case did the court so much as hint that the existence of a contract between the physicians and the insurer, or its alleged breach, meant that a claim for unfair methods of competition would be barred. *Id.*

While it is true that the court did not suggest that the existence of a contract precludes an unfair competition claim, it is also true that the court did not intimate for a moment that an ordinary breach of contract claim is, without more, sufficient to sustain an unfair competition claim. *See* Defs.' Reply 3. Indeed, *Hawaii Medical Ass'n* was no ordinary breach of contract case. The matter involved a claim that a health insurer had engaged in an unfair and deceptive scheme through the systematic denial, reduction, or delay of reimbursement to physicians for medically necessary services for its insureds. *Hawaii Med. Ass'n*, 113 Hawai'i at 88, 148 P.3d at 1190.

However, the Court recognizes that Plaintiffs are not asserting just any breach of contract. They contend that Shell's alleged breach involves the enforcement of liquidated damages provisions in the Recapture Agreements which work to impose penalties upon them. Compl. ¶¶ 17, 33. Courts from other jurisdictions interpreting statutes similar to HRS § 480–2 have held that the enforcement of such provisions may, under certain circumstances, constitute unfair methods of competition or unfair or deceptive acts or practices.

In *American Car Rental, Inc. v. Commissioner of Consumer Protection,* 273 Conn. 296, 869 A.2d 1198 (2005), a clause in a car rental agreement imposed a $150 charge every time a rental car was driven over seventy-nine miles per hour. *Id.* at 1204–05. The speed information was obtained from GPS devices installed in the rental cars. *Id.* The Connecticut Supreme Court held that the clause imposed a penalty that was offensive to public policy and that its enforcement therefore constituted an unfair practice under the Connecticut Unfair Trade Practices Act. *Id.* at 1207–08.

Similarly, in *District Cablevision Ltd. v. Bassin,* 828 A.2d 714 (D.C.2003), a provision in an agreement between a cable television provider and subscribers required that subscribers pay a late charge or administrative fee if they were late with their payments in an amount set by the provider. *Id.* at 718. The provider increased the fee from $2 to $5. *Id.* The increase was not based on any analysis or estimate of the costs the provider actually incurred or anticipated incurring as a result of late payment. *Id.* Instead, the charge was designed simply to motivate subscribers to pay in a timely fashion. *Id.* At trial, the jury found that the late fee provision was not a valid liquidated damages clause. *Id.* at 720. On appeal, the District of Columbia Court of Appeals concluded that the provision offended the common law of contracts and that the cable television company's enforcement of the provision was therefore actionable as an unlawful trade practice under the District of Columbia Protection Procedures Act. *Id.* at 722–26.

Finally, in *Bondanza v. Peninsula Hospital & Medical Center,* 23 Cal.3d 260, 152 Cal.Rptr. 446, 590 P.2d 22 (1979), a provision in a hospital's admission agreements with patients required patients to pay the hospital charges due on the date of discharge and that, if the account was referred to a collection agency or an attorney for collection, the patient would pay reasonable attorney's fees and collection expenses. *Id.* at 23. The hospital had an agreement with a collection agency under which the hospital was required to pay the agency a commission of one-third the amount owed by the patient at the time of any assignment, plus any accrued interest thereafter collected. *Id.* When a patient's account was assigned to the agency, the agency would demand collection costs in the amount of one-third of the amount owed by the patient at the time of the assignment, plus interest. *Id.* The Califor-

Special policy considerations arise when an insurer improperly denies benefits to its insureds. Those considerations are simply not present in an ordinary breach of contract case. *See Best Place v. Penn Am. Ins. Co.,* 82 Hawai'i 120, 132, 920 P.2d 334, 346 (1996) ("[T]he policy considerations surrounding the adoption of the tort of bad faith in the insurance context are atypical and will not necessarily extend to all types of contracts."); *Francis v. Lee Enters.,* 89 Hawai'i 234, 242 n.

3, 971 P.2d 707, 715 n. 3 (1999) (noting that the decision to abolish the tort of tortious breach of contract "in no way affect[ed][the] prior decisions, such as *Best Place,* recognizing the tort of bad faith within the insurance context"). Thus, the Court does not read *Haw. Med. Ass'n* as suggesting that a run-of-the-mill breach of contract is, by itself, enough to give rise to an unfair competition claim.

nia Supreme Court held that the provision was not a valid liquidated damages provision under a California statute governing the enforceability of liquidated damages clauses and that its enforcement was thus an unlawful business practice under California's unfair competition statute. *Id.* at 25–27. *But cf. Californians for Population Stabilization v. Hewlett–Packard Co.,* 58 Cal.App.4th 273, 67 Cal.Rptr.2d 621, 629 (App.1997) (questioning whether a violation of California's statute governing the enforceability of liquidated damages clauses constitutes unlawful conduct as contemplated by the state's unfair competition statute).

The question in the case at hand is whether the enforcement of a liquidated damages provision that imposes a penalty may rise to the level of being "unfair" within the meaning of HRS § 480–2(a). The Hawai'i Supreme Court has on two occasions observed that "liquidated damages functioning as a penalty for breach are impermissible in contract law," citing Professor Arthur L. Corbin's treatise on contract law. *Francis v. Lee Enters.,* 89 Hawai'i 234, 241–42, 971 P.2d 707, 714–15 (1999) (citing 5 Arthur L. Corbin, *Corbin on Contracts* § 1057, at 334 (1964)); *Sentinel Ins. Co. v. First Ins. Co.,* 76 Hawai'i 277, 296, 875 P.2d 894, 913 (1994) (citing 5 Corbin, *Corbin on Contracts* § 1057, at

334). The revised edition of the treatise teaches that:

> Courts ritualistically list three criteria by which a valid liquidated damages clause may be distinguished from an invalid penalty clause. In order to qualify as a liquidated damages clause: first, the parties must intend to provide for damages rather than for a penalty; second, the injury caused by the breach must be uncertain or difficult to quantify; third, the sum stipulated must be a reasonable pre-estimate of the probable loss.

11 Joseph M. Perillo, *Corbin on Contracts* § 58.1, at 398 (2005).[7] The treatise further explains that: "Although penalties are unenforceable, they are not illegal nor are they against public policy; they are deemed unconscionable as a matter of law. A penalty clause does not infect the entire contract; the clause is excised." *Id.* § 58.4, at 412–13.[8]

In addition, in *Jenkins v. Wise,* 58 Haw. 592, 574 P.2d 1337 (1978), the Hawai'i Supreme Court noted that, "even where equity declines to grant relief from the forfeiture of the purchaser's equitable interest in the land, it may nevertheless order the return of that portion of the purchase price already paid which it finds would constitute a penalty, rather than reasonable liquidated damages, for the breach."

7. The Hawai'i legislature codified the rule against penalty clauses when it adopted Article 2 of the Uniform Commercial Code. Specifically, HRS § 490:2–718(1), which applies to transactions in goods, provides that:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

HRS § 490:2–718(1). Professor Corbin's treatise notes that the Uniform Commercial

Code's formulation of the rule against penalties differs from the common law approach insofar as it evaluates "whether the sum is a reasonable pre-estimate of the probable or actual loss." 11 *Corbin on Contracts* § 58.1, at 398 (emphasis in original).

8. Unlike Professor Corbin's treatise, which does not view a penalty provision as violative of public policy, the Restatement (Second) of Contracts § 365(1) (1981) states that "[a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."

*Id.* at 598, 574 P.2d at 1341–42. The court cited in support of this conclusion the case of *Howard v. Bar Bell Land & Cattle Co.*, 81 Idaho 189, 340 P.2d 103 (1959). There, the Idaho Supreme Court explained that, " 'where the forfeiture or damage fixed by the contract is arbitrary and bears no reasonable relation to the anticipated damage, and is exorbitant and unconscionable, it is regarded as a penalty, and the contractual provision therefor is void and unenforceable.' " *Id.* at 107 (quoting *Graves v. Cupic*, 75 Idaho 451, 456, 272 P.2d 1020, 1023 (1954)).

■ The authorities that the Hawai'i Supreme Court has relied upon in discussing the rule against penalty clauses would seem to suggest that such clauses are void and unenforceable for the reason that they are "unconscionable." The term, when used to describe a transaction, is understood to mean "showing no regard for conscience; affronting the sense of justice, decency, or reasonableness." *Black's Law Dictionary* 1664 (9th ed.2009). Consequently, it would appear that the enforcement of a penalty clause could, under certain circumstances, be viewed as "unfair" under the three factors set forth in *Sperry & Hutchinson*. In other words, the enforcement of a penalty clause could be seen as being within a penumbra of a common-law concept of unfairness, as being immoral, unethical, oppressive, or unscrupulous, and as being substantially injurious to consumers, competitors, or other businessmen. *See Sperry & Hutchinson*, 405 U.S. at 244 n. 5, 92 S.Ct. 898. Thus, the Court concludes that the enforcement of a penalty provision could conceivably give rise to an unfair competition claim under HRS § 480–2.

■ In the case at bar, Plaintiffs allege that the liquidated damages provisions in Articles 6(b) and 6(c) of the Recapture Agreements bear no relation to Shell's actual damages, which were not difficult to estimate at the time the Agreements were executed. Compl. ¶¶ 17, 33. They therefore assert that the liquidated damages represent penalties to discourage them from exercising their rights to terminate under the Agreements. *Id.* Assuming that these allegations are true, as the Court must at this stage, it would appear that the provisions are void and unenforceable as unconscionable penalty provisions. *See Fed'n of African Am. Contractors*, 96 F.3d at 1207.

Plaintiffs also assert that, despite their allegedly timely notice of termination consistent with Section 2(d) of the Recapture Agreements Addenda, Shell has sought to improperly enforce the alleged penalty provisions by insisting that they either pay the damages or continue to perform under the Agreements. *Id.* ¶¶ 13–16, 29–32. Plaintiffs contend that, prior to giving their notice of termination, Shell was aware of their negotiations with its competitors, Aloha Petroleum and Mid Pac Petroleum, to purchase gasoline at a cheaper price than that offered by Shell. *Id.* ¶¶ 18–19, 34–35. Plaintiffs claim that, as a result of Shell's conduct, they were injured in their business and property. *Id.* ¶ 39.

The Court is well aware that the facts in this case are markedly different than and a far cry from those in the cases discussed above in which courts have held that the enforcement of a penalty provision is an unfair practice, as those cases concerned the enforcement of such a provision against consumers, and not retailers. *See Am. Car Rental*, 869 A.2d at 1204–05, 1207–08; *Dist. Cablevision*, 828 A.2d at 722–26; *Bondanza*, 152 Cal.Rptr. 446, 590 P.2d at 26–27. Nonetheless, the Court recognizes that HRS § 480–2 was intended to protect not only consumers, but also " 'honest businessmen and businesswomen.' " *See Robert's*, 91 Hawai'i at 255 n.

34, 982 P.2d at 884 n. 34 (quoting *Han,* 84 Hawai'i at 177, 931 P.2d at 619). The Court is also cognizant that whether a practice constitutes an unfair method of competition or a deceptive or unfair act or practice is generally a question of fact. *See Kukui Nuts v. R. Baird & Co.,* 7 Haw.App. 598, 612, 789 P.2d 501, 511 (1990) ("The question of whether an unfair or deceptive trade practice exists is a question of fact."); *cf. Hawaii Med. Ass'n,* 113 Hawai'i at 108, 148 P.3d at 1210 (" 'Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case.' " (quoting *Cieri,* 80 Hawai'i at 60, 905 P.2d at 35)). In view of these considerations, the Court finds that Plaintiffs' allegations of Shell's improper enforcement of penalty provisions tend to show unfairness on Shell's part.

### C. Antitrust Allegations

In addition to alleging that Shell has improperly sought to enforce penalty provisions, Plaintiffs also contend that Shell improperly refused to accept their termination of the Agreements in order to prevent them from entering into agreements with its competitors, maintain its dominant market position on Maui, and charge higher prices than would otherwise be available. Compl. ¶¶ 44–45. Thus, Plaintiffs contend that Shell sought to dominate the market and control prices. *See id.* These allegations seem to be alluding to a monopolization claim under HRS § 480–9.

The statute provides that "[n]o person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade or commerce in any commodity in any section of the State." HRS § 480–9. "An attempt to monopolize claim, under HRS § 480–9, requires proof: (1) that the defendant has engaged in predatory or anticompetitive conduct with; (2) a specific intent to monopolize; and (3) a dangerous

probability of achieving monopoly power." *Robert's,* 91 Hawai'i at 254, 982 P.2d at 883.

In this case, although Plaintiffs have not explicitly referred to HRS § 480–9, their allegations as to Shell's market domination would appear to raise issues under the statute or at least the policy or spirit of the statute. *See id.* at 255 n. 34, 982 P.2d at 884 n. 34 (" 'The word "unfair" means conduct that (1) threatens an incipient violation of an antitrust law, or (2) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or (3) otherwise significantly threatens or harms competition.' " (quoting *Cel–Tech,* 83 Cal. Rptr.2d 548, 973 P.2d at 544) (brackets omitted)). Plaintiffs' market-domination allegations would thus appear to support their assertion that Shell has engaged in "unfair" competition.

Viewing the factual allegations in the Complaint in the light most favorable to Plaintiffs, the Court cannot say as a matter of law that Plaintiffs have failed to sufficiently state an unfair competition claim under HRS § 480–2. *See Fed'n of African Am. Contractors,* 96 F.3d at 1207. Shell's motion to dismiss Count I of the Complaint will be denied accordingly. The Court will now consider Shell's motion to dismiss Count II of the Complaint.

### II. Count II of the Complaint: Interference With a Prospective Economic Advantage

In Count II, Plaintiffs allege a claim for tortious interference with a prospective economic advantage. They contend that they had a valuable and reasonable business expectancy disrupted by Shell. Compl. ¶ 41. They explain that they were negotiating with Aloha Petroleum and Mid Pac Petroleum to purchase gasoline at a lower price. *Id.* ¶ 42. Plaintiffs maintain

that Shell had actual knowledge of those negotiations and that it purposefully acted with an improper motive of harming them when it improperly refused to accept their termination in order to prevent them from entering into agreements with other companies to purchase gasoline at a lower price. *Id.* ¶¶ 43–44. Plaintiffs insist that Shell also acted with the improper motive of retaining as much business as possible so as to maintain its dominant market position on Maui and charge higher prices than would otherwise be available. *Id.* ¶ 45. Plaintiffs assert that Shell's actions disrupted their ability to reach an agreement to purchase gasoline at a lower price and that they have consequently suffered damages. *Id.* ¶¶ 46–47. They further maintain that Shell acted knowingly, willfully, and maliciously and with the intent to injure or oppress them. *Id.* ¶ 48. On that basis, they claim that they are entitled to recover exemplary and punitive damages. *Id.*[9]

Shell contends in its motion that Count II must be dismissed because there can be no claim for tortious interference with a prospective economic advantage based on its exercise of its contractual rights even if such an exercise amounted to a breach of the Agreements. Def.'s Mem. 18. It asserts that a party to contract cannot recover for tortious interference with a prospec-

tive economic advantage against the other contracting party based on conduct that would constitute a breach of contract. *Id.* at 24–25.

### A. Background on Tortious Interference With a Prospective Business Advantage

The intentional tort of tortious interference with a prospective business advantage was "definitively recognized" by the Hawai'i Supreme Court in the *Robert's* case. 91 Hawai'i at 257, 982 P.2d at 886. The court explained that the elements of the tort are:

> (1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

*Id.* at 259, 982 P.2d at 888.

"The third element [of the tort]-intent-denotes purposefully improper interfer-

---

**9.** It would appear that the applicable statute of limitations for a tortious interference claim is HRS § 657–7, which sets a two-year limitations period. *See Roberts v. City & County of Honolulu,* CV. NO. 07–00391 DAE–KSC, 2008 WL 563475, at *4, 2008 U.S. Dist. LEXIS 16068, at *10–*11 (D.Haw. Mar. 3, 2008) ("Although Hawaii courts have not specifically addressed the question of whether the two-year statute of limitations or the six-year statute of limitations applies to intentional interference with contract and prospective business relationships claims, Hawaii courts have stated that the two-year statute of limitations generally applies to tort actions, and that intentional interference with contract and pro-

spective business relationships claims are torts."). In addition, with respect to Count I, the applicable statute of limitations for an unfair competition claim is set forth in HRS § 480–24, which provides that: "Any action to enforce a cause of action arising under [HRS ch. 480] shall be barred unless commenced within four years after the cause of action accrues, except as otherwise provided in [HRS §§ 480–24(b) and] 480–22. For the purpose of this section, a cause of action for a continuing violation is deemed to accrue at any time during the period of the violation." The Court expresses no opinion as to any statute of limitations issues at this time since the parties did not raise or brief these issues.

ence and requires a state of mind or motive more culpable than mere intent." *Hawaii Med. Ass'n,* 113 Hawai'i at 116, 148 P.3d at 1218 (quotation marks omitted). The Hawai'i Supreme Court has further explained that:

> "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference, and
>
> (g) the relations between the parties."

*Robert's,* 91 Hawai'i at 259, 982 P.2d at 888 (quoting Restatement (Second) of Torts § 767, at 25–26) (brackets omitted); *see also Hawaii Med. Ass'n,* 113 Hawai'i at 116, 148 P.3d at 1218 (" '[T]he plaintiff must prove that the defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact. Asserting one's rights to maximize economic interests does not create an interference of ill will or improper purpose.'" (quoting *Omega Envtl.,* 127 F.3d at 1166)).

## B. Whether a Breach of Contract Can Constitute Improper Interference

In this case, Shell's argument is in effect that a breach of contract cannot, without more, constitute "improper interference" for purposes of the tort of tortious interference with a prospective business advan-

tage. *See* Def.'s Mem. 24–25. This presents an interesting question.

On the one hand, comment c to the Restatement (Second) of Torts § 767 (1979) explains that "economic pressure" may constitute "improper conduct," and the Reporter's Notes illustrate the comment by citing a Washington case, *Cherberg v. Peoples Nat'l Bank of Washington,* 88 Wash.2d 595, 564 P.2d 1137 (1977), in which the improper conduct was found where the "defendant's acts breached [a] separate contract with [the] plaintiff." Restatement (Second) of Torts § 767 cmt. c & Report's Note to clause (a). Under this line of authority, where "a party breaches a contract with the immediate purpose of injuring or destroying prospective business relationships the means may be considered improper." *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984); *accord Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 309 (Utah 1982) ("Neither a deliberate breach of contract nor an immediate purpose to inflict injury which does not predominate over a legitimate economic end will, by itself, satisfy this element of the tort. However, they may do so in combination."); *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.,* 28 F.Supp.2d 947, 951 (E.D.Pa.1998) (applying Pennsylvania law). The rationale underlying this approach is that "contract damages provide an insufficient remedy for a breach prompted by an immediate purpose to injure, and that purpose does not enjoy the same legal immunity in the context of contract relations as it does in the competitive marketplace." *Leigh,* 657 P.2d at 309.

The Hawai'i Supreme Court relied on both the Restatement (Second) of Torts § 767 and Washington law in adopting the tort of tortious interference with a prospective business advantage. *See Robert's,* 91 Hawai'i at 258, 982 P.2d at 887 (citing,

*inter alia,* Restatement (Second) of Torts §§ 766B, 767; *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1166 (9th Cir. 1997)); *Omega Envtl.,* 127 F.3d at 1166 (applying Washington's formulation of tortious interference with a prospective business advantage). But, at the same time, the court also relied on a treatise and California law. *See Robert's,* 91 Hawai'i at 258–59, 982 P.2d at 887–88 (citing, *inter alia, Locricchio v. Legal Services Corp.,* 833 F.2d 1352, 1357 (9th Cir.1987); 2 Joseph D. Zamore, *Business Torts* §§ 12.01[4]–12.03[6], at 12–11 to 12–46 (1999)); *Locricchio,* 833 F.2d at 1357 (predicting that the Hawai'i Supreme Court would follow California law in defining the elements of tortious interference with a prospective business advantage).

The revised edition of the treatise teaches that, for purposes of tortious interference with a prospective business advantage claim, the improper conduct "must also be more than a mere breach of contract." 2 Phillip J. Campanella *et al., Business Torts* § 12.03, at 12–49 (Rev. ed.2009). Relying on California law, the treatise reasons that, "[a]llowing a breach of contract claim to support this tort 'would be contrary to the cautious policy of the courts about extending tort remedies to ordinary commercial contracts.'" *Id.* (quoting *Quantum Assocs., Inc. v. Symbol Techs., Inc.,* No. C 01–02789 CRB, 2002 WL 1735356, at \*1, 2002 U.S. Dist. LEXIS 13632, at \*3 (N.D.Ca. Jul. 11, 2002)). Another justification for this approach is that, "[i]f a contract plaintiff could plead in a conclusory way that the defendant maliciously intended to drive the plaintiff out of business, the tort of interference with prospective business advantage would be routinely pleaded in breach of contract cases." *Khoury v. Maly's of California,* 14 Cal.App.4th 612, 17 Cal.Rptr.2d 708, 712 (App.1993), *questioned on other grounds, Burrows v. Orchid Island TRS, LLC,* CASE NO. 07CV1567–BEN (WMC),

2008 WL 744735, at \*5, 2008 U.S. Dist. LEXIS 21120, at \*15 (S.D.Cal. Mar. 18, 2008) (pleading issue). Other cases are in accord. *See JRS Products, Inc. v. Matsushita Elec. Corp. of Am.,* 115 Cal.App.4th 168, 8 Cal.Rptr.3d 840, 852 (App.2004) ("[A] breach of contract claim cannot be transmuted into tort liability by claiming that the breach interfered with the promisee's business."); *Income Properties/Equity Trust v. Wal–Mart Stores,* 33 F.3d 987, 990 (8th Cir.1994) (applying Arkansas law).

In short, the authorities cited by the Hawai'i Supreme Court in *Robert's* provide no clear indication as to how the court would resolve the question of whether a breach of contract, if done for improper reasons, such as to injure the plaintiff's economic relations, can constitute improper interference. Still, as Shell correctly observes, the court's decision in *Francis* tends to suggest that it would answer the question in the negative. In that case, the court abolished the rule that, "'where a contract is breached in a wanton or reckless manner so as to result in a tortious injury, the aggrieved person is entitled to recover in tort.'" *See Francis,* 89 Hawai'i at 237, 244, 971 P.2d at 710, 717 (quoting *Dold v. Outrigger Hotel,* 54 Haw. 18, 22, 501 P.2d 368, 372 (1972)). The court held that "Hawai'i law will not allow a recovery in tort, including a recovery of punitive damages, in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends the breach of the contract." *Id.* at 244, 971 P.2d at 717. However, the court noted that its decision "in no way affect[ed][its] prior decisions ... recognizing the tort of bad faith within the insurance context." *Id.* at 242 n. 3, 971 P.2d at 715 n. 3.

The now-abolished tort of tortious breach of contract was premised on a wanton or reckless breach of contract. *Id.* at

237, 971 P.2d at 710. In the jurisdictions that have concluded that a breach alone may give rise to liability for tortious interference, the breach must be accompanied by the "immediate purpose of injuring or destroying prospective business relationships." *See, e.g., Harsha*, 346 N.W.2d at 799. Thus, if a court were to conclude that a breach of contract could satisfy the improper interference element of the tort of tortious interference with a prospective business advantage under Hawai'i law, it would be tantamount to resurrecting the tort of tortious breach of contract, albeit it in certain limited circumstances. Given that the *Francis* court abolished the tort of tortious breach of contract, the Court predicts that, if presented with the question, the Hawai'i Supreme Court would hold that a breach of contract, even if done for improper purposes, does not without more give rise to improper interference for purposes of a tortious interference with a prospective business advantage claim. *See Burlington Ins. Co. v. Oceanic Design & Constr., Inc.*, 383 F.3d 940, 944 (9th Cir. 2004) ("To the extent [a] case raises issues of first impression [under Hawai'i law], [a] court, sitting in diversity, 'must use its best judgment to predict how the Hawaii Supreme Court would decide [the] issue.'" (quoting *Helfand v. Gerson*, 105 F.3d 530, 537 (9th Cir.1997))). Consequently, insofar as Plaintiffs' tortious interference claim is premised on a mere breach of contract, the Court is inclined to dismiss the claim as a matter of law.

## C. Whether an Unfair Method of Competition Under HRS § 480–2 can Constitute Improper Interference

It would appear, however, that Plaintiffs' tortious interference claim is not based solely on a breach of contract. As noted earlier, the alleged breach in this case also serves as the basis for an unfair competition claim under HRS § 480–2. *See supra* Discussion Section I. The issue under *Francis* is whether Shell's alleged conduct could conceivably violate a duty that is independently recognized by principles of tort law and that transcends the breach of the Agreements. *See* 89 Hawai'i at 244, 971 P.2d at 717. The duty to refrain from tortiously interfering in another's prospective business relationships has been recognized in principles of tort law. *See Robert's*, 91 Hawai'i at 257, 982 P.2d at 886.

The remaining question is whether Shell's violation of that duty could conceivably transcend its alleged breach of the Agreements. In evaluating the nature of the defendant's conduct for purposes of a tortious interference claim, one consideration is whether the defendant's conduct is "unlawful." Restatement (Second) of Torts § 767 cmt. c. "Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper." *Id.* "This may be true, for example, of conduct that is in violation of antitrust provisions or is in restraint of trade or of conduct that is in violation of statutes, regulations, or judicial or administrative holdings regarding labor relations." *Id.; see also id.* § 767 cmt. e ("[T]he fact that a contract violates public policy, as, for example, a contract in unreasonable restraint of trade, or that its performance will enable the party complaining of the interference to maintain a condition that shocks the public conscience, may justify an inducement of breach that, in the absence of this fact, would be improper." (citation omitted)). *But see JRS Products*, 8 Cal. Rptr.3d at 851 (rejecting the contention that the breach of a contract, which also constitutes unfair competition under the

California unfair competition statute, constitutes improper conduct for purposes of a tortious interference claim).

 Here, the Court has concluded that Plaintiffs have sufficiently stated an unfair competition claim under HRS § 480–2 against Shell based on Shell's enforcement of the alleged penalty provisions set forth in Articles 6(b) and 6(c) of the Recapture Agreements and its efforts to dominate the market on Maui. *See supra* Discussion Section I. If it is ultimately found that such conduct violates HRS § 480–2, then it would seem that such conduct would also be sufficient to establish the improper interference element of the tort of tortious interference with a prospective business advantage because it would violate a duty that transcends the breach of the Agreements. *See Francis*, 89 Hawai'i at 244, 971 P.2d at 717.

Accordingly, the Court finds that Plaintiffs have sufficiently alleged the "improper interference" element of the tort of tortious interference with a prospective business relationship in Count II of the Complaint. Shell does not appear to assert, for purposes of its motion to dismiss, that Plaintiffs have failed to adequately allege the other elements of the tort. The Court will therefore deny Shell's motion to dismiss Count II of the Complaint.

### CONCLUSION

In accordance with the foregoing, the Court:

(1) DENIES Shell's motion to dismiss Count I of the Complaint (unfair methods of competition under HRS § 480–2); and

(2) DENIES Shell's motion to dismiss Count II of the Complaint (tortious interference with a prospective business advantage).

IT IS SO ORDERED.